ORIGINAL

FILED
AUG 1 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **BLR GROUP OF AMERICA, INC.,** | ) |
| **1701 River Run, Suite 750,** <br> **Fort Worth, Texas 76107-6553** | ) |
| **Plaintiff,** | ) 07-579 C |
| **v.** | ) **Case No.** ______ |
| **THE UNITED STATES OF AMERICA** | ) |
| **Defendant.** | ) |

## COMPLAINT

1. This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Rules of the United States Court of Federal Claims and for injunctive relief pursuant to RCFC 65. The dispute relates to a contract between the parties for air traffic management support services.

2. Plaintiff respectfully seeks this Court's declaration that the Defendant's evaluation of Plaintiff's performance is false and highly prejudicial to Plaintiff and an order from this Court directing Defendant to rescind or modify that evaluation.

## PARTIES

3. Plaintiff is BLR Group of America, Inc. ("BLR Group"), a Texas corporation whose principal place of business is in Fort Worth, Texas.

4. Defendant is the United States of America, acting by and through (1) the United States Air Force (the "Air Force"), as the contracting agency, and (2) the Naval Sea Logistics Center, as manager of the Past Performance Information Retrieval System.

## JURISDICTION

5. This Court has jurisdiction over the subject matter of this action and the parties pursuant to 28 U.S.C. § 1491, *et seq.* and 41 U.S.C. § 601, *et seq.*

6. Plaintiff appeals two final decisions under the Contract Disputes Act.

## FACTS

### A. Contract

7. BLR Group is a certified Section 8(a) small-business service provider that supports airline, general aviation, military, technology, and government clients.

8. On or about April 14, 2006, the Air Force awarded BLR Group a commercial item contract, No. FA4452-06-C-0003, to provide Air Traffic Management support services to the Directorate of Communications and Information's Air Traffic Management Systems Office (AMC/A67) (the "Contract").

9. The Contract was awarded for one (1) base year and four (4) option years, on a firm fixed-price basis, with some cost-reimbursable items. The Contract required BLR Group to provide "functional, technical liaison, and analytical support in accordance with the Performance Work Statement." The Performance Work Statement ("PWS") identified and defined BLR Group's required tasks, but left many performance items to the discretion of the parties. The following excerpts from the PWS illustrate this point:

- "The Contractor shall support the AMC ATM systems modernization efforts … *as required.*"
- "The Contractor shall provide system integration support for specific projects/subtasks *identified by AMC/A67.*"

- "The Contractor shall establish system/software testing/protocols and procedures/interfaces . . . , *as required.*"
- "The Contractor shall provide subject matter expertise on the [National Airspace System ("NAS")] Management Design documents and related system documents *as required.*"
- "Deliverables for this task *may include*, but are not limited to, technical reports, white papers, briefings, and trip reports."
- The final deliverable shall follow Government-provided formats . . . . The Contractor *shall interact* with the Government . . . to *gather* requirements, background information . . . and assumptions."

(Contract (Ex. A), § 1.5, pp. 27-29)(emphases added).

- "All deliverables *shall meet professional standards and meet the requirements* set forth in the PWS."

(Contract (Ex. A), § 1.6, p. 29)(emphasis added).

- "The Contractor shall initiate work on this contract by meeting with AMC/A67 representatives to ensure a *common understanding* of the requirements . . . ."

(Contract (Ex. A), § 4.11, p. 32)(emphasis added).

- Delivery dates for substantive deliverables are "*as required.*"

(Contract (Ex. A), § 1.6, pp. 29-30).

**B. Role of QAP**

10. The lead Quality Assurance Personnel ("QAP") represented the Air Force in assigning and administering tasks under the open-ended contract provisions cited above.

11. In addition, the QAP was "responsible for overall surveillance of the contract." The QAP's surveillance duties included monitoring BLR Group's performance of contract tasks and fairly and objectively evaluating BLR Group's performance.

**C. Subcontract**

12. On or about March 1, 2006, BLR Group entered into a subcontract with an independent contractor. The subcontractor served as chief engineer under the Contract.

13. During contract performance, BLR Group personnel observed an inappropriately close personal relationship between the subcontractor and the lead QAP.

14. In early June of 2006, BLR Group questioned the propriety of some of the subcontractor's billing submissions.

15. On or about June 8, 2006, the subcontractor abruptly terminated his relationship with BLR Group and his work under the Contract and subcontract.

**D. Contract Performance**

16. BLR Group met or exceeded the requirements of the Contract with respect to every deliverable.

17. Following the subcontractor's departure, the Air Force, acting through the QAP, wholly failed in its duty to cooperate with BLR Group and, in fact, hindered BLR Group's performance by imposing unreasonable requirements and unreasonably monitoring and evaluating BLR Group's contract performance.

**E. Unreasonable Requirements**

18. On or about June 26, 2006, the QAP assigned BLR Group a complex task that called for a detailed study and analysis of certain proposed changes by the Federal Aviation Administration to National Airspace System Management Documents (the "NAS MD Analysis"). The purpose of

the NAS MD Analysis was to identify the potential impact of the proposed changes on the Air Force's flight planning systems.

19. The Air Force required delivery of the NAS MD Analysis within 10 business days, which was a wholly inadequate period of time within which to perform this task. Nevertheless, BLR Group met the Air Force's deadline with the best possible deliverable.

20. Following BLR Group's initial submission, the QAP admitted her instructions for the NAS MD Analysis were misleading and that the time allotted to BLR Group was insufficient. Nevertheless, the QAP rejected BLR Group's submission and granted only an additional 3 days to re-submit a new version.

21. Within the 3-day period allotted for resubmission, BLR Group met with the QAP and Contracting Office personnel and demonstrated that more time was needed to adequately prepare and deliver the NAS MD Analysis. Contracting Office personnel then accorded BLR Group 30, rather than 3, more days in which to prepare and submit the document.

22. BLR Group timely re-submitted the NAS MD Analysis, but the QAP again rejected it.

23. The QAP also imposed on BLR Group requirements that were not included in the Contract. For example, the QAP insisted that BLR Group personnel be on base at all times during business hours. Although the Contract provided that space would be available on base for BLR Group personnel, it did not require that BLR Group personnel be on base at all times during business hours.

**F. Unreasonable Monitoring and Evaluation**

24. Initially, the QAP provided appropriate guidance and monitored BLR Group's performance by communicating directly with the subcontractor on a daily basis. Following the

subcontractor's sudden termination of his relationship with BLR Group, the QAP severely curtailed her availability to BLR Group for guidance or any other communications.

25. BLR Group frequently requested reviews and clarifications, "vector checks", and weekly updates with the QAP, in order to verify that BLR Group's deliverables would be satisfactory upon final delivery. The QAP rejected several deliverables that BLR Group prepared according to guidance she offered at these interim meetings, even after she had assured BLR Group that their work would more than satisfy the Air Force's requirements.

26. For example, prior to finalizing the revised NAS MD Analysis described above, BLR Group submitted several sample documents to the QAP with requested "vector checks." The QAP confirmed that BLR Group's substantive approach and format were acceptable. Nevertheless, the QAP rejected the deliverables that were associated with her "vector checks."

27. As indicated above, BLR Group timely delivered a revised NAS MD Analysis, on or about August 14, 2006. This deliverable fully complied with Contract requirements. That same day, the QAP purportedly sent the NAS MD Analysis to the Federal Aviation Administration ("FAA") and the GDSS Program Office of the Air Force for independent verification and validation ("IV&V").

28. FAA reviewers offered no negative comments about BLR Group's analysis of the impact of proposed changes on the Air Force's systems. In fact, upon information and belief, the analysts who reviewed the NAS MD Analysis <u>agreed</u> with BLR Group's analysis of the impact of those changes.

29. Upon information and belief, the GDSS Program Office at Scott Air Force Base, to which the NAS MD Analysis was sent, also agreed with the substance of BLR Group's report.

30. The Air Force rejected the deliverable, relying on the IV&V, which the QAP characterized as revealing that the "NAS MD System Analysis is not usable due to the serious technical deficiencies in the report."

31. At the Air Force's invitation, BLR Group submitted a detailed rebuttal of the IV&V. The Air Force did not respond to BLR Group's rebuttal.

32. On or about June 23, 2006, BLR Group timely submitted the NAS Aeronautical Information Management Enterprise System Report ("NAIMES Report") deliverable to the QAP.

33. Several weeks after the QAP had accepted the NAIMES Report, the QAP proposed a revision to it, requesting that BLR Group rearrange the list of recommendations included in the report. BLR Group rearranged the report exactly as the QAP had requested and re-submitted it on or about August 30, 2006.

34. On or about September 18, 2006, the Air Force rejected the revised NAIMES Report. The rejection letter cited many of the same specific technical deficiencies that the Air Force had cited in rejecting the NAS MD Analysis, even using some of the exact same language. In rejecting the NAIMES Report, the Air Force even cited technical issues that were totally irrelevant to the NAIMES Report, though they had been part of the NAS-MD Analysis.

35. At the Air Force's invitation, BLR Group submitted a detailed technical rebuttal of the NAIMES Report rejection. The Air Force did not respond to that rebuttal.

**G. Termination of Contract**

36. On or about September 26, 2006, the Air Force terminated the Contract for convenience.

## H. False and Prejudicial CPAR

37. The Air Force was required to prepare a Contractor Performance Assessment Report ("CPAR") evaluating BLR Group's performance under the contract.

38. A CPAR is "past performance" information that will be available to all procurement officials to assist them in evaluating a contractor's "responsibility," as necessary for award of any government contract. As such, the content of a CPAR evaluation is vitally important to a contractor's ability to win future government contracts.

39. Because of the importance of past performance information to future government procurements, the Air Force has an obligation to assure the objectivity and accuracy of each contractor's CPAR evaluation.

40. On or about September 22, 2006, BLR Group clearly articulated to the Air Force its concern that the QAP could not be objective in her evaluation of BLR Group, as demonstrated throughout contract administration. BLR Group respectfully requested that a new QAP be assigned to the Contract.

41. The Air Force did not respond to BLR Group's concerns about the QAP or to its request for a new QAP. Instead, the Air Force relied on the QAP to prepare the narrative and ratings for BLR Group's CPAR.

42. On or about November 21, 2006, the Air Force delivered BLR Group's CPAR, with ratings and narrative prepared by the QAP.

43. The CPAR rated BLR Group's performance as "marginal" (less than satisfactory) for each of the following evaluation criteria: (1) Quality of Product/Service; (2) Schedule; (3) Business Relations; and (4) Management of Key Personnel.

44. The QAP's CPAR narrative was replete with misrepresentations and inaccuracies. For example, in all but one of the above-listed categories, the QAP stated:

> Due to BLR Group's failure to deliver, the NAS MD project is now seriously behind schedule and is directly impacting GDSS' development schedule. NAS v1.6 will begin fielding in early 2007; however due to the set back [sic] in system analysis, the earliest GDSS will be able to begin coding the required changes will be after receipt of the new analysis, placing AMC in the precarious position of having its flight planning system impacted by the v1.6 release.

Except for the phrase "NAS v1.6 will begin fielding in early 2007," this statement is false. When the QAP drafted the CPAR evaluation in the fall of 2006, it was clear that there could be no delay of the type the QAP attributes to BLR Group's alleged "failure." By July 2006, the GDSS program office knew it could not begin coding for any required changes to the system before February, 2007. Thus, it was clear that, even if a new Analysis had had to be performed, there was ample time for that to be accomplished without delaying the "NAS MD project" or GDSS's development schedule.

45. The statement is also false because BLR Group had timely delivered a competent and accurate report. Reports performed by others have since confirmed its conclusion—that proposed changes would have no impact on AMC's flight planning system. Thus, even if delay had occurred because the Air Force commissioned a new NAS MD Analysis (which it did not, per the above), that delay would not be attributable to BLR Group's "failure." Instead, it would be caused by the Air Force's unreasonable rejection of BLR Group's perfectly satisfactory deliverable.

46. On January 9, 2007, BLR Group met with the Assessing Official, the QAP, and other Air Force personnel to discuss the CPAR, as allowed by Air Force CPAR regulations. At the meeting, BLR Group rebutted many false claims in the CPAR assessment with substantive proof. The Air Force provided little information in return. BLR Group particularly sought information

about the CPAR and the process used to prepare it, but the Air Force refused information on that subject.

47. At the Assessing Official's invitation, BLR Group submitted written questions following the meeting. The Air Force has not yet responded to those questions.

48. On or about January 12, 2007, BLR Group timely submitted its written comments in response to the CPAR. These comments explained why the CPAR was not a fair or accurate evaluation of BLR Group's performance under the Contract and that the marginal ratings were unwarranted. Moreover, BLR Group's written comments again questioned the objectivity of the QAP who was involved in preparing the CPAR narrative. BLR Group requested that the Assessing Official exercise her discretion to re-evaluate the CPAR and correct the initial ratings and narrative.

49. On or about February 7, 2007, the Air Force issued a final CPAR that reflected no substantive modification to the original CPAR. The Air Force made one modification to the Management of Key Personnel section, but failed to correct the numerous inaccuracies addressed by BLR Group at the meeting and in its written comments. Thus, the inaccuracies and unwarranted ratings remain in the CPAR.

50. The issuance of this final CPAR constituted a final decision under the Contract Disputes Act.

**I. The PPIRS Database**

51. The Past Performance Information Retrieval System ("PPIRS") is the database through which CPAR assessments are reported to procurement officials. It currently displays AMC/A67's damaging and inaccurate CPAR assessment twice before presenting BLR Group's substantive rebuttal.

52. In PPIRS, the Air Force's final assessment is displayed under Item 20, "Assessing Official Narrative." It is a reiteration of the original CPAR narrative with only a very slight modification. Nevertheless, after displaying this barely modified version, the database also displays the entire original narrative, under the misleading heading "Contractor Comments." Only after these two nearly identical narratives does the database display BLR Group's rebuttal thereof.

53. The database's repetition of the Air Force's long narrative makes it twice as onerous for future procuring officials to discover BLR Group's responsive comments, which exonerate BLR Group from the allegations included in the Air Force's narrative.

54. On or about March 5, 2007, after seeing its CPAR on PPIRS, BLR Group requested the Reviewing Official delete the original narrative from the database version, leaving only the Air Force's final narrative and BLR Group's comments (now displayed under the appropriate heading "Contractor's Comments"). The Government denied the request, which constituted a final decision under the Contract Disputes Act.

## COUNT I

55. Paragraphs 1 – 54 are hereby incorporated by reference as if set forth here in full.

56. The Air Force authored a false and highly prejudicial CPAR with respect to BLR Group's performance under the Contract. Because of its availability to all government procurement officials, the CPAR has the potential to substantially damage BLR Group's business reputation.

57. It would be just and proper for the Court, upon a hearing of the evidence, to direct the Air Force to revise the CPAR to make it fair and accurate and consistent with the facts, or, alternatively, to rescind the CPAR in its entirety.

## COUNT II

58. Paragraphs 1 – 54 are hereby incorporated by reference as if set forth here in full.

59. The format of the CPAR displayed in the PPIRS is highly prejudicial to BLR Group, because it highlights and repeats the false and highly prejudicial narrative authored by the Air Force and obscures BLR Group's rebuttal of same.

60. It would be just and proper for the Court, upon a hearing of the evidence, to direct the Air Force and/or Naval Sea Logistics to revise the PPIRS version of the CPAR such that the Air Force's narrative appears only once, in the appropriate field, and BLR Group's comments appear alone in the field designated for "Contractor's Comments," or, alternatively, to direct the Air Force to rescind the CPAR assessment in its entirety.

**PRAYER**

WHEREFORE, BLR Group requests that this Court:

(A) enter a judgment declaring the Air Force's CPAR false and highly prejudicial to BLR Group;

(B) enter a judgment declaring the PPIRS format of displaying the CPAR unfairly prejudicial to BLR Group;

(C) enter an injunction directing the Air Force to revise the CPAR or, alternatively, to rescind the CPAR in its entirety;

(D) enter an injunction directing the Air Force (and/or Naval Sea Logistics) to revise the PPIRS version of the CPAR, or, alternatively, rescind the CPAR in its entirety;

(E) assess all costs of court to the Air Force; and

(F) award such other and further relief as may be deemed just and proper by this Court.

DATED: July 31, 2007

Respectfully submitted,

Timothy F. Noelker
(Counsel of Record)
Linda L. Shapiro
Ryan K. Manger
Mary Catherine Hodes

THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101
314-552-6000
FAX 314-552-7000

GREENSFELDER, HEMKER & GALE, P.C.
Thomas F. Hennessy, III, #01190156
12 Wolf Creek, Suite 100
Swansea, IL 62226
618-257-7308
FAX 618 257-7353

Attorneys for BLR Group of America, Inc.