# In the United States Court of Federal Claims

No. 07-579 C
(Filed: November 25, 2008)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| BLR GROUP OF AMERICA, INC., * | |
| * | RCFC 12(b)(1); Contract Disputes Act of |
| Plaintiff, * | 1978, 41 U.S.C. §§ 601-613; Performance |
| * | Evaluation; Definition of Claim; |
| v. * | Nonmonetary Relief; "Jurisdictional |
| * | Parity" with Boards of Contract Appeals; |
| THE UNITED STATES, * | Contracting Officer's Final Decision; |
| * | Deemed Denial |
| Defendant. * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Timothy F. Noelker, St. Louis, MO, for plaintiff.

William P. Rayel, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court in the above-captioned case is defendant's motion to dismiss plaintiff's complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiff alleges that government personnel prepared and disseminated an unfair and inaccurate evaluation of its performance under a contract with the United States Air Force ("Air Force") and seeks appropriate declaratory and injunctive relief. Defendant contends that the court lacks jurisdiction over plaintiff's allegations. For the reasons set forth below, the court grants in part and denies in part defendant's motion.

## I. BACKGROUND[1]

Plaintiff BLR Group of America, Inc. is a Texas corporation that provides support services for airline, general aviation, military, technology, and government clients. Compl. ¶¶ 3, 7. On April 14, 2006, the Air Force awarded plaintiff a contract "to provide Air Traffic

---

[1] The court derives the facts from plaintiff's complaint ("Compl."), the exhibits attached to BLR Group's Memorandum in Opposition to Defendant's Motion to Dismiss ("Ex."), the attachments to Defendant's Supplemental Brief Regarding Defendant's Motion to Dismiss ("Attach."), and the attachments to the Joint Response to the Court's October 22, 2008 Order ("Joint Attach.").

Management support services to the Directorate of Communications and Information's Air Traffic Management Systems Office (AMC/A67)." Id. ¶ 8. In particular, plaintiff was required "to provide 'functional, technical liaison, and analytical support in accordance with the Performance Work Statement,'" which identified a variety of required and discretionary tasks. Id. ¶ 9 (quoting the contract). The contract was awarded for one base year and four subsequent option years "on a firm fixed-price basis, with some cost-reimbursable items." Id. The total contract award amount was $564,968. Attach. 5 at 1.

The Air Force designated the lead Quality Assurance Personnel ("QAP") as its representative in assigning and administering tasks under the contract. Compl. ¶ 10. The lead QAP was also responsible for monitoring and "fairly and objectively evaluating" plaintiff's contract performance. Id. ¶ 11.

Prior to contract award, plaintiff hired a subcontractor to serve as its chief engineer. Id. ¶ 12. "During contract performance, [plaintiff's] personnel observed an inappropriately close personal relationship between the subcontractor and the lead QAP." Id. ¶ 13. In early June 2006, plaintiff questioned some of the bills it received from the subcontractor. Id. ¶ 14. On June 8, 2006, less than two months after contract award, "the subcontractor abruptly terminated his relationship with [plaintiff] and his work under the Contract and subcontract." Id. ¶ 15. Plaintiff contends that upon the subcontractor's departure, the lead QAP "wholly failed" to cooperate with plaintiff and "hindered [plaintiff]'s performance by imposing unreasonable requirements and unreasonably monitoring and evaluating [plaintiff]'s performance." Id. ¶ 17; see also id. ¶¶ 18-23 (describing unreasonable requirements), 24-35 (describing unreasonable monitoring and evaluation). Ultimately, the Air Force terminated the contract for convenience on September 26, 2006. Id. ¶ 36.

According to plaintiff, the Air Force was required to evaluate plaintiff's performance under the contract in a Contractor Performance Assessment Report ("CPAR"). Id. ¶ 37; accord Ex. D at 1 ("The Federal Acquisition Regulation requires all Federal agencies to collect past performance information on contracts."). CPARs contain information about a contractor's performance and are used by procurement officials to determine a contractor's "responsibility" when evaluating the contractor's bid for work on a subsequent contract. Compl. ¶ 38; see also Attach. 1 at 1 ("The primary purpose of the [Contractor Performance Assessment Reporting System] is to ensure that accurate data on contractor performance is current and available for use in source selections . . . . Performance assessments will be used as a resource in awarding best value contracts and orders to contractors that consistently provide quality, on-time products and services that conform to contractual requirements."). Thus, plaintiff notes, the content of a CPAR "is vitally important to a contractor's ability to win future government contracts." Compl. ¶ 38. Due to the importance of the CPAR and its belief that the lead QAP "could not be objective in her evaluation," plaintiff requested, four days before the Air Force terminated the contract for convenience, that another QAP be assigned to the contract. Id. ¶ 40. The Air Force did not respond to plaintiff's request and thus, upon the contract's termination, the lead QAP prepared both the narrative and the ratings for plaintiff's CPAR. Id. ¶ 41; accord Joint Attach. 6

at 4 (noting that the lead QAP and the alternate QAP wrote the CPAR).  Presumably, the lead
QAP forwarded the narrative and ratings to the Assessing Official, Nancy Kreke, for review.[2]
See Ex. D at 2 (identifying Ms. Kreke as the Assessing Official); Attach. 1 at 8-9 (noting the
Assessing Official's responsibility to review the evaluation narrative prepared by her
representative).  The Assessing Official signed the CPAR on November 21, 2007, noting, as
required, her title of contracting officer.  Joint Attach. 6 at 2.  That same day, via an electronic
mail message, she notified plaintiff that an initial CPAR had been prepared and was ready for
plaintiff's review.  Compl. ¶ 42; Ex. D; see also Attach. 1 at 8-9 (noting the Assessing Official's
responsibility to forward the CPAR to the contractor).

In the CPAR, the Air Force rated plaintiff's performance as "'marginal' (less than
satisfactory)" for four evaluation criteria: (1) Quality of Product/Service; (2) Schedule; (3)
Business Relations; and (4) Management of Key Personnel.  Compl. ¶ 43; Joint Attach. 6 at 1.
Further, plaintiff alleges that the narrative in the CPAR "was replete with misrepresentations and
inaccuracies."  Compl. ¶ 44.  Thus, pursuant to the guidelines set forth in the November 21, 2006
electronic mail notification message, plaintiff requested a meeting with the Air Force to discuss
the CPAR.  Ex. B; Ex. D at 2; see also Attach. 1 at 9 ("If the contractor desires a meeting to
discuss the CPAR, it must be requested, in writing, no later than seven calendar days from the
receipt of the CPAR.").  The meeting occurred on January 9, 2007, and included the following
participants: plaintiff, the Assessing Official, the lead QAP, and other Air Force personnel.
Compl. ¶ 46.  Plaintiff indicates that during the meeting, it provided substantive rebuttals to
many of the items in the CPAR and requested information from the Air Force concerning how it
prepared the CPAR.  Id.  The Air Force did not provide plaintiff with the information it sought,
id., but the Assessing Official invited plaintiff to submit written questions, id. ¶ 47; see also Ex.
D at 1 ("You are encouraged to review the assessment, provide comments, and indicate your
concurrence/non-concurrence with the Government's review.  . . .  Your response is due back to
our office within 30 days after receipt of this notification."); Attach. 1 at 9 (noting the thirty-day
review period).

Plaintiff submitted written comments in response to the initial CPAR signed by the
Assessing Official/contracting officer on January 12, 2007.  Compl. ¶ 48; Joint Attach. 6 at 2, 4-
7.  The comments concerned both the inaccuracies contained in the CPAR and the possible
biases of the lead QAP who prepared the CPAR.  Compl. ¶ 48; Joint Attach. 6 at 2, 4-7.  Plaintiff
"requested that the Assessing Official exercise her discretion to re-evaluate the CPAR and
correct the initial ratings and narrative."  Compl. ¶ 48; accord Joint Attach. 6 at 7 ("I do not
concur with this assessment and request that it be reevaluated.").  On February 7, 2007, the Air
Force issued a final CPAR that contained "one modification to the Management of Key
Personnel section," but otherwise "reflected no substantive modification to the original CPAR."
Compl. ¶ 49; see also Attach. 1 at 10 (noting that if disagreement persists between the Assessing
Official and the contractor concerning the performance evaluation, the CPAR is finalized when

---

[2]  In addition to serving as the Assessing Official, Ms. Kreke functioned as the contracting
officer.  Ex. B; Joint Attach. 6 at 2.

the Reviewing Official reviews the disputed CPAR, adds any necessary comments, and signs the CPAR).

The final CPAR was disseminated to other procurement officials via the Past Performance Information Retrieval System ("PPIRS"), which is managed by the Naval Sea Logistics Center.  Compl. ¶¶ 4, 51; see also Attach. 1 at 1 (indicating that CPARs are "for use in source selections through the Past Performance Informational Retrieval System"), 10 (noting that a CPAR is posted to the PPIRS and "available for source selection official use" when the Reviewing Official signs the CPAR); Attach. 4 at ¶¶ 1-2 (noting that an employee of the Naval Sea Logistics Center administers the PPIRS).  In the PPIRS entry for plaintiff's contract with the Air Force, the Air Force's final CPAR is displayed under the heading "Assessing Official Narrative."  Compl. ¶ 52.  Then, under the heading "Contractor Comments," the text of the original, unmodified CPAR is displayed, followed by plaintiff's substantive rebuttal.  Id.; see also Attach. 4 at ¶ 4 (indicating that "[w]hen an Assessing Official revises his or her rating after contractor comments, both the original rating and the revised version, as well as the contractor comments, will appear in the 'Contractor Comments' section of the CPAR, as displayed in the PPIRS").  On March 7, 2007, plaintiff requested that the Reviewing Official, Eric Hassenplug, delete the text of the original CPAR from the PPIRS, leaving the final CPAR and the contractor's substantive rebuttal under their correct headings.  Compl. ¶ 54; Ex. C.  Plaintiff submitted its request to Mr. Hassenplug via electronic mail, providing:

> You will notice that the above version of the CPAR for [plaintiff] repeats all of the [Assessing Official]'s comments at the beginning of the "Contractor's Comment" section.

> Please remove this duplication at your very earliest convenience.  Also, I would appreciate hearing from you when this is completed.

Ex. C.  The government refused plaintiff's request.  Compl. ¶ 54.

Given the government's refusal to amend the CPAR and remove the text of the original CPAR from the PPIRS, plaintiff filed a complaint in this court on August 1, 2007.  Plaintiff seeks a declaration that the final CPAR was "false and highly prejudicial" and an injunction requiring the Air Force to revise or rescind the final CPAR and the PPIRS entry.[3]  Id. ¶¶ 1, 57, 60; Compl. Prayer ¶¶ (A)-(D).  Plaintiff also seeks an assessment of costs against the Air Force and "such other and further relief as may be deemed just and proper . . . ."  Compl. Prayer ¶¶ (E)-(F).  Defendant subsequently filed the instant motion, contending that the court lacks jurisdiction over plaintiff's complaint because, in violation of the Contract Disputes Act of 1978 ("CDA"), Pub. L. No. 95-563, 92 Stat. 2383 (codified as amended at 41 U.S.C. §§ 601-613 (2000)),

---

[3]  In this opinion, the court does not address the propriety of the particular relief requested by plaintiff; the court's ruling is confined solely to its jurisdiction over the subject matter of plaintiff's complaint.

plaintiff has not filed a claim with the contracting officer and the contracting officer has not issued a final decision. Briefing concluded on November 6, 2008. Oral argument is deemed unnecessary.

## II.  LEGAL STANDARDS

### A.  RCFC 12(b)(1) Motion to Dismiss

In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor. Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). However, plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction. Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974); Reynolds, 846 F.2d at 747. If the court concludes that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B.  Subject Matter Jurisdiction

Whether the court has jurisdiction to decide the merits of a case is a threshold matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868). The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time. Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969).

The Tucker Act, the principal statute governing the jurisdiction of this court, provides that the Court of Federal Claims has jurisdiction over claims against the United States that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2000). In addition, the Tucker Act provides the Court of Federal Claims with "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including . . . nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." Id. § 1491(a)(2).

## C.  Contract Disputes Act of 1978

Plaintiff's claims in the instant case arise under 28 U.S.C. § 1491(a)(2), which gives the court jurisdiction over CDA claims.  The CDA provides that if a contractor has a dispute with the government "relating to a contract," the contractor shall make a written claim to the contracting officer.  41 U.S.C. § 605(a).  The contracting officer is then required to issue a decision "within a reasonable time."[4]  Id. § 605(c)(3); see also L & D Servs., Inc. v. United States, 34 Fed. Cl. 673, 677 (1996) ("Section 605(c) establishes maximum periods within which a contracting officer must issue a decision on a claim–either within 60 days or within a reasonable time.").  The decision must be in writing, "shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this chapter."  41 U.S.C. § 605(a); accord 48 C.F.R. § 33.211 (2006).  If a contracting officer fails to issue a decision "within the period required," the failure is deemed to be a decision denying the claim.  41 U.S.C. § 605(c)(5).  The decision of the contracting officer is final unless the contractor makes an authorized appeal.  Id. § 605(b).  A contractor may appeal a contracting officer's decision to the Court of Federal Claims.  Id. § 609(a)(1); see also Sharman Co. v. United States, 2 F.3d 1564, 1568 (Fed. Cir. 1993) ("Under the CDA, a final decision by the contracting officer on a claim, whether asserted by the contractor or the government, is a 'jurisdictional prerequisite' to further legal action thereon."), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1572 (Fed. Cir. 1995) (en banc).

## III.  DISCUSSION

### A.  Plaintiff Presented a Valid Claim to the Contracting Officer

The first question before the court is whether plaintiff presented a valid claim to the contracting officer.  The CDA does not define "claim."  Thus, to determine whether a contractor's demand constitutes a claim, the court must look to the regulations "implementing the CDA, the language of the contract in dispute, and the facts of the case."  Reflectone, Inc., 60 F.3d at 1575.  There is no relevant contract language and the parties have not cited any "unusual facts that would affect" the court's decision.  See id. at 1575 n.3.  Thus, the court focuses on the Federal Acquisition Regulation ("FAR"), which provides that a claim is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract."  48 C.F.R. § 52.233-1.  Because plaintiff is not seeking money damages or the adjustment of contract terms, plaintiff's claim must be a written demand seeking, as a matter of right, relief arising under or relating to the contract.  See also Reflectone, Inc., 60 F.3d at 1576 (holding that "the FAR requires a 'claim' to be a written demand seeking a sum certain (or other contract relief) as a matter or right").  However, there is "no requirement in the

---

[4]  Because plaintiff seeks nonmonetary relief, the sixty-day time period for the contracting officer's decision specified in 41 U.S.C. § 605(c)(1)-(2) is inapplicable.

[CDA] that a 'claim' must be submitted in any particular form or use any particular wording." Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987).

Plaintiff asserts that it made two valid claims to the contracting officer: (1) its January 12, 2007 written response to the CPAR requesting that the Assessing Official correct the ratings and narrative contained in the initial CPAR, Compl. ¶ 48; BLR Group's Mem. Opp'n Def.'s Mot. Dismiss ("Opp'n") 5, and (2) its March 7, 2007 electronic mail message requesting that Mr. Hassenplug delete the text of the initial CPAR from the "Contractor's Comment" section of the PPIRS entry, Compl. ¶ 54; Opp'n 5-6. Defendant contends that neither communication constitutes a claim. Def.'s Mot. Dismiss ("Mot.") 4-8. Specifically, defendant asserts that plaintiff has not requested relief from the contracting officer as a matter of right because plaintiff "has not asserted any contractual ground upon which it is entitled to a specific performance evaluation."[5] Id. at 5. Indeed, argues defendant, the Court of Federal Claims lacks jurisdiction to review performance evaluations. Id.

Defendant correctly states that a contractor's claim must seek relief as a matter of right. See Reflectone, Inc., 60 F.3d at 1575-76. The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has explained this requirement: "[T]he phrase 'as a matter of right' in the regulatory definition of 'claim' requires only that the contractor specifically assert entitlement to the relief sought. That is, the claim must be a demand for something due or believed to be due . . . ." Alliant Techsys., Inc. v. United States, 178 F.3d 1260, 1265 (Fed. Cir. 1999). Defendant interprets the Federal Circuit's explanation as requiring plaintiff to assert a "contractual ground upon which it is entitled to a specific performance evaluation." Mot. 5; accord id. at 8 ("Unless a contract contains a clause giving the contractor a right to a certain type of performance evaluation, a challenge to a performance evaluation cannot be a CDA 'claim' . . . ."); Def.'s Reply Pl.'s Opp'n Def.'s Mot. Dismiss ("Reply") 2 (contending that plaintiff has "failed to cite a single contractual provision entitling it to a performance evaluation or any specific performance evaluation"). Defendant further contends that if plaintiff does not allege that the performance evaluation was based on an erroneous interpretation of the contract, there is no valid claim under the CDA. Mot. 7; Reply 5-6. Defendant's interpretation of Alliant Techsystems, Inc. is too narrow. In Alliant Techsystems, Inc., the Federal Circuit's conclusion that the appellant contractor met the "matter of right" requirement by "assert[ing] specific contractual and legal grounds" for entitlement, 178 F.3d at 1265, was based upon the facts presented in that case and did not constitute a minimum standard for what plaintiff was required to assert in its claim. See also Record Steel & Constr., Inc. v. United States, 62 Fed. Cl. 508, 519 (2004) (concluding that the Federal Circuit "was only explicating the facts before it" and was not holding "that contractors must make explicit legal arguments in their letters to the contracting officer requesting non-monetary relief"). Similarly, the Federal Circuit's holding cannot be construed to require a contractor to tie the performance evaluation to a specific contract provision.

---

[5] Defendant does not contest that plaintiff submitted a "written demand" to the contracting officer seeking "relief arising under or relating to [the] contract." See 48 C.F.R. § 52.233-1.

Accordingly, plaintiff need not assert a specific contractual provision to meet the "matter of right" requirement.  Plaintiff is only required to assert entitlement that has some legal basis.

Here, plaintiff seeks a fair and accurate CPAR and a properly formatted PPIRS entry. Compl. ¶¶ 57, 60.  Specifically, plaintiff contends that its "written comments to the initial CPAR evaluation claimed entitlement to the relief of a correct CPAR" and that "[a]fter the final CPAR evaluation was published in the PPIRS database," it "demanded in writing that the CPAR be corrected."  Opp'n 5.

As a threshold matter, the court must determine whether plaintiff was legally entitled to a CPAR.  Plaintiff asserts that its entitlement to a fair and accurate CPAR arises from the FAR and Air Force regulations.  See Compl. ¶ 46 (referring to "Air Force CPAR regulations"); Ex. B (responding, in a November 27, 2006 letter to the contracting officer, to a "CPARS Notification" electronic mail message that indicated that "the CPARS process is designed to fairly evaluate [plaintiff's] performance"); Ex. D (indicating, in a November 21, 2006 "CPARS Notification" electronic mail message, that "[t]he Federal Acquisition Regulation requires all Federal agencies to collect past performance information on contracts," that the Contractor Performance Assessment Reporting System was "implemented to comply with this regulation," and that "the CPARS process is designed to fairly evaluate [plaintiff's] performance").  The relevant FAR provides: "[A]gencies shall prepare an evaluation of contractor performance for each contract that exceeds the simplified acquisition threshold at the time the work under the contract is completed.  . . .  The content and format of performance evaluations shall be established in accordance with agency procedures . . . ."  48 C.F.R. § 42.1502(a).  Defendant argues that because the Air Force terminated the contract for its convenience, "'work under the contract' was never 'completed.'"  Mot. 6; cf. Reply 5 (contending that "the Air Force's issuance of a performance evaluation was discretionary, rather than required by regulation").  Defendant's reading of the FAR is strained.  When the Air Force terminated the contract for its convenience, plaintiff was no longer obligated to perform work pursuant to the terms of the contract.  Thus, plaintiff's "work under the contract" was "completed."  Further, plaintiff's contract had a value of $564,968, Attach. 5 at 1, an amount in excess of the $100,000 "simplified acquisition threshold," FAR § 2.101.[6]  Moreover, the Air Force obviously disagreed with defendant's

_____

[6]  The first sentence of 48 C.F.R. § 42.1502(a)–"[A]gencies shall prepare an evaluation of contractor performance for each contract that exceeds the simplified acquisition threshold at the time the work under the contract is completed"–has two possible interpretations.  One interpretation is that an agency is required to prepare a performance evaluation at the conclusion of contract work for every contract exceeding the simplified acquisition threshold.  Under this interpretation, the Air Force was required to prepare an evaluation of plaintiff because the contract, as awarded, exceeded the threshold.  The other interpretation is that an agency is required to prepare a performance evaluation only at the moment that contract work exceeds the simplified acquisition threshold.  Under this interpretation, the Air Force was required to prepare an evaluation of plaintiff because even at termination, the contract exceeded the threshold.  See Joint Attach. 4 at 2 (indicating that the final contract value was $250,337.25).  Thus, regardless

interpretation of the FAR because it did, in fact, issue a performance evaluation.  Accordingly, the court concludes that plaintiff was legally entitled to a performance evaluation.

A logical corollary to the court's conclusion that plaintiff is legally entitled to a performance evaluation is that plaintiff is legally entitled to a fair and accurate performance evaluation.  It would be nonsensical to find an entitlement to a performance evaluation but to hold that the evaluation need not be fair or accurate.  Indeed, the Air Force has recognized the need for fair and accurate performance evaluations.  When implementing the performance evaluation requirements contained in FAR part 42.15, the Air Force crafted regulations that specifically required the use of the "Contractor Performance Assessment Reporting System (CPARS) to record evaluations of contractor performance" and directed acquisition personnel to refer to the Department of Defense "CPARS Policy Guide" for "[g]uidance on systematically assessing contractor performance and using past performance information . . . ."[7]  AFFARS § 5342.1503; see also Attach. 1 at i (noting that the Contractor Performance Assessment Reporting System implements the requirements of FAR part 42 concerning contractor performance information).  According to the CPARS Policy Guide, "[t]he primary purpose of the CPARS is to ensure that accurate data on contractor performance is current and available for use in source selections."  Attach. 1 at 1.  Given the identified "primary purpose," to allow anything less than fair and accurate information in a CPAR would be a disservice to the contractor and other government agencies considering doing business with the contractor.[8]

---

of which interpretation of the first sentence of 48 C.F.R. § 42.1502(a) the court utilizes, it is clear that the Air Force was required to perform an evaluation of plaintiff.

[7]  These regulations are found in the Air Force Federal Acquisition Regulation Supplement ("AFFARS"), which "establishes uniform policies and procedures for the Air Force implementing and supplementing the Federal Acquisition Regulation (FAR), the Department of Defense FAR Supplement (DFARS), and other Department of Defense publications concerning contracting."  AFFARS § 5301.101 (2008).

[8]  Moreover, an unfair or inaccurate CPAR may, depending upon the circumstances, constitute a breach of the implied covenant of good faith and fair dealing.  See Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005) ("The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty . . . not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract. The duty applies to the government just as it does to private parties." (citations omitted)); N. Star Alaska Hous. Corp. v. United States, 76 Fed. Cl. 158, 187-212 (2007) (discussing the merits of the contractor's claims under the CDA for breach of the implied covenant of good faith and fair dealing and citing St. Regis Paper Co. v. United States, 368 U.S. 208, 229 (1961) (Black, J., dissenting) ("It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their Government.")); M.A. DeAtley Constr., Inc. v. United States, 75 Fed. Cl. 575, 580-81 (2007) (holding that the Court of Federal Claims possessed jurisdiction over a contractor's claim

Defendant attacks the applicability of the CPARS Policy Guide, arguing that "[s]ince the policy guide was not incorporated into the contract, [plaintiff] has no contractual right to have the agency follow that policy guide.  The agency could rescind the policy guide at any time."  Reply 2.  Once again, defendant's narrow focus on contractual rights is inappropriate.[9]  Furthermore, defendant's argument does not negate the fact that entitlement to a fair and accurate performance evaluation is inherent in the entitlement to a performance evaluation.  In sum, because plaintiff has cited legal grounds for entitlement to a fair and accurate performance evaluation, it has adequately met the "matter of right" requirement for submitting a CDA claim seeking a fair and accurate CPAR.  Because there is no question that plaintiff's request for a fair and accurate CPAR was made to the contracting officer in writing and sought relief related to the contract,[10]

---

under the CDA for a breach of the implied covenant of good faith and fair dealing); Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

[9]  It also bears noting that although the Department of Defense could "rescind the policy guide at any time," there is no evidence that the Department of Defense rescinded the CPARS Policy Guide before the Air Force issued plaintiff's CPAR.  Moreover, the fact that the Department of Defense could rescind the CPARS Policy Guide is of no moment.  Defendant cannot argue that performance evaluations–whether issued pursuant to the CPARS Policy Guide or otherwise–may be made in an utterly arbitrary and irrational manner.

[10]  Defendant asserts that plaintiff was required to include in its claim a specific request that the contracting officer issue a decision within sixty days.  Reply 7.  Defendant's argument is premised on the language of 41 U.S.C. § 605(c)(1), which provides that "[a] contracting officer shall issue a decision on any submitted claim of $100,000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period."  However, as noted previously, section 605(c)(1) is inapplicable in the instant case because plaintiff is not seeking monetary relief.  Thus, plaintiff was not required to specifically request a decision within sixty days.  Further, even if section 605(c)(1) applied to plaintiff's claim, the provision does not require the contractor to set forth the sixty-day deadline in its claim.  First, such a requirement would be redundant since the provision already required the contracting officer to render a decision within sixty days.  See also Contract Cleaning Maint., Inc., 811 F.2d at 592 (noting, in a case where the contractor did not include a request for a decision "within sixty days," that there is "no requirement in the [CDA] that a 'claim' must be submitted in any particular form or use any particular wording").  Moreover, the United States Court of Claims ("Court of Claims")–the predecessor court of the Federal Circuit and the Court of Federal Claims–has stated that if a "contractor fails to request that the contracting officer issue his decision within sixty days, the contracting officer then has a 'reasonable time' within which to render a decision" pursuant to section 605(c)(3).  Paragon Energy Corp. v. United States, 225 Ct. Cl. 730, 733 (1980).  In other words, a contractor's failure to state a specific time frame does not disqualify a submission to the contracting officer from constituting a claim.  Accordingly, for all of the above-stated reasons, defendant's argument lacks merit.

see supra note 5, plaintiff has submitted a valid claim under the CDA.  This conclusion is consistent with the ruling in Record Steel & Construction, Inc.[11]  See 62 Fed. Cl. at 519 (concluding that plaintiff's "letter to the contracting officer's representative" requesting an amendment to its performance evaluation sought "relief relating to the contract pursuant to a claim of right").

The court's next task is to determine whether plaintiff is legally entitled to a properly formatted PPIRS entry.  Defendant contends first that plaintiff "has not pointed to any contract provision that gives it the right to have its performance evaluation displayed in a certain manner."[12]  Reply 2-3 n.3.  Again, the court notes that the Federal Circuit's holding in Alliant Techsystems, Inc. does not limit plaintiff to a contractual basis for entitlement.  So long as plaintiff grounds its entitlement on some legal basis, plaintiff has met the "matter of right" requirement for filing a CDA claim.  Plaintiff's purported claim concerning its PPIRS entry is its March 7, 2007 electronic mail message requesting that Mr. Hassenplug delete the text of the original CPAR from the "Contractor's Comment" section of the PPIRS entry.  See Compl. ¶ 54; Opp'n 5-6.  Plaintiff does not expressly state the basis for its requested change in the electronic mail message itself.  However, plaintiff implies in its opposition brief that its entitlement to a properly formatted PPIRS arises from the same regulations that entitle it to a fair and accurate performance evaluation.  See Opp'n 5-6.  The court does not agree.

_____

[11]  In its opposition brief, plaintiff contends that "[t]he well-settled doctrine of stare decisis should guide this Court to follow its earlier decision in Record Steel."  Opp'n 9 (citing Fla. Power & Light Co. v. United States, 41 Fed. Cl. 477, 485-86 (1998), rev'd on other grounds, 198 F.3d 1358 (Fed. Cir. 1999)).  Plaintiff misreads the decision in Florida Power & Light Co., in which the Court of Federal Claims clearly states that "[i]n the absence of a subsequent overruling or change in applicable law, a question of law decided by a court is binding upon all future litigants in the lower courts subject to that court's appellate jurisdiction."  Fla. Power & Light Co., 41 Fed. Cl. at 486 (emphasis added).  Indeed, the Court of Federal Claims is bound only by precedent of the United States Supreme Court and the Federal Circuit.  See FCC v. Pottsville Broad. Co., 309 U.S. 134, 140 (1940) ("[A] lower court is bound to respect the mandate of an appellate tribunal and cannot reconsider questions which the mandate has laid at rest."); Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims.").  Prior decisions of the Court of Federal Claims, "while persuasive, do not set binding precedent for separate and distinct cases" in the Court of Federal Claims.  W. Coast Gen. Corp. v. Dalton, 39 F.3d 312, 315 (Fed. Cir. 1994).

[12]  Defendant also argues that because PPIRS is managed by the Naval Sea Logistics Center and is not controlled by the contracting officer, alterations to a PPIRS entry cannot be the subject of a CDA claim.  Reply 2-3 n.3.  Because the court disposes of plaintiff's claim on alternative grounds, the court need not address this contention.

Part 42.15 of the FAR requires agencies to collect, maintain, and share performance evaluations. The Air Force, pursuant to AFFARS section 5324.1503 and the CPARS Policy Guide, requires that performance evaluations, i.e., CPARs, be maintained on the PPIRS. See Attach. 1 at i. Prior to a CPAR being made available on the PPIRS, it is reviewed by the Assessing Official, the contractor, and, if disagreement remains, the Reviewing Official. See Def.'s Supplemental Br. Regarding Def.'s Mot. Dismiss ("Def.'s Br.") 2-3; Attach. 1 at 8-10. The Assessing Official may revise the CPAR and both the contractor and Reviewing Official can add comments to the CPAR. See Def.'s Br. 2-3; Attach. 1 at 8-10. There is no question that the CPAR review and commenting process is performed pursuant to the FAR and the AFFARS. See FAR § 42.1503; AFFARS § 5342.1503. However, neither the FAR nor the AFFARS addresses what must occur after a CPAR has been posted to the PPIRS aside from general statements that performance evaluations must be "retained," FAR § 42.1503(b), "maintain[ed]," id. § 42.1503(d), and "share[d]," id. § 42.1503(c). Moreover, the CPARS Policy Guide limits its discussion of what must occur after a CPAR has been posted to the PPIRS to the confidentiality of the information contained in the PPIRS and the use of the information contained in the PPIRS for source selection purposes. Attach. 1 at 14-15. Because the regulations and CPARS Policy Guide do not address the manner in which a PPIRS entry is displayed or formatted, there is no legal basis for plaintiff to assert a CDA claim regarding the display or format of its PPIRS entry. Thus, plaintiff's March 7, 2007 electronic mail message to Mr. Hassenplug is not a claim for the purposes of the CDA.[13]

Although it has concluded that plaintiff submitted to the contracting officer a valid claim under the CDA for a fair and accurate performance evaluation, the court finds it necessary to address defendant's assertion that the Court of Federal Claims generally lacks the jurisdiction to review performance evaluations.[14] Mot. 5-8. Defendant's argument is based on the decision of the Federal Circuit in Alliant Techsystems, Inc., which addressed whether the Tucker Act provided the Court of Federal Claims with jurisdiction over a contractor's request for a declaration that it was not required to perform under a contract's options clause. See id.; 178 F.3d at 1263, 1268-72. In Alliant Techsystems, Inc., the government argued that "the

---

[13] Moreover, plaintiff does not allege, and the evidence does not suggest, that the March 7, 2007 electronic mail message was submitted to the contracting officer, as required by 41 U.S.C. § 605(a). The absence of such an allegation provides an alternative basis for rejecting plaintiff's argument that its March 7, 2007 electronic mail message constituted a CDA claim.

[14] In advancing its argument, defendant argues that the Court of Federal Claims generally lacks the "jurisdiction to amend or rescind contract performance evaluations." Mot. 5. The phrase "amend or rescind" misleadingly implies that defendant's argument is restricted to jurisdiction to award injunctive relief. It is clear that defendant's argument more broadly includes the jurisdiction to review performance evaluations altogether. See, e.g., id. at 6 ("[T]he boards have specifically held that a request for review of a performance evaluation is not a 'claim' pursuant to the CDA."), 8 ("[A] challenge to a performance evaluation cannot be a CDA 'claim' and this Court does not possess jurisdiction to entertain such a complaint.").

nonmonetary disputes referred to in the Tucker Act" did not include those disputes where the contractor "could convert the claim into one for monetary relief." 178 F.3d at 1268. The Federal Circuit held that "[t]he government's definition of nonmonetary disputes is not supported by the language of the statute . . . or by this court's precedents." Id. Examining the language of the statute, the Federal Circuit noted that "[i]n defining the jurisdiction of the Court of Federal Claims over CDA disputes, Congress has chosen expansive, not restrictive, language" and thus "[t]he government's argument for a restrictive definition of the term nonmonetary disputes is at odds with the open-ended language used in the statute." Id. The Federal Circuit then explained that "[t]he government's restrictive definition of the statutory reference to 'nonmonetary disputes' also does not square with this court's decision in Garrett v. General Electric Co., 987 F.2d 747 (Fed. Cir. 1993)." Alliant Techsys., Inc., 178 F.3d at 1269. Garrett concerned a dispute over the validity of the government's directive to the contractor to repair or replace defective engines. Id. at 1270. In its decision, the court "noted that in the 1992 amendments to the Tucker Act,[15] Congress intended to ensure 'jurisdictional parity' between the boards of contract appeals and the Court of Federal Claims" and then "held that the [contractor's] nonmonetary claim provided a viable basis for board jurisdiction." Id. at 1269-70 (quoting Garrett, 987 F.2d at 750-51) (footnote added). Analyzing the Garrett court's statement concerning "jurisdictional parity" in conjunction with its holding that the board of contract appeals had jurisdiction over the contractor's claim for nonmonetary relief, the Federal Circuit concluded that "the Garrett case stands for the proposition that nonmonetary claims are not outside the jurisdiction of the Court of Federal Claims simply because the contractor could convert the claims to monetary claims by doing the requested work and seeking compensation afterwards." Id. at 1270.

In the instant case, defendant hinges its argument on the Federal Circuit's statement that "in the 1992 amendments to the Tucker Act, Congress intended to ensure 'jurisdictional parity' between the boards of contract appeals and the Court of Federal Claims." Mot. 5 (citing Alliant Techsys., Inc., 178 F.3d at 1269). Defendant contends that because "[t]he boards of contract appeals have consistently held that they do not possess jurisdiction" to review performance evaluations, the Court of Federal Claims was precluded on "jurisdictional parity" grounds from exercising jurisdiction to review performance evaluations. Id. Defendant is mistaken. In Alliant

---

[15] The 1992 amendments to the Tucker Act ("1992 amendments") added the following underlined text to 28 U.S.C. § 1491(a)(2):

> The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub. L. No. 102-572, § 907(b)(1), 106 Stat. 4506, 4519 (emphasis added).

Techsystems, Inc., the Federal Circuit explicitly held that the Garrett court's statement concerning the "jurisdictional parity" provided by the 1992 amendments merely meant that the government's definition of "nonmonetary disputes," which excluded those nonmonetary claims that could be converted into claims for monetary relief, was too narrow. See 178 F.3d at 1270. In fact, the court found clear support for an expansive definition of the term "nonmonetary disputes" that was added to the Tucker Act with the 1992 amendments. See id. at 1268-70. Moreover, the 1992 amendments did not make the jurisdictional holdings of the boards of contract appeals binding on the Court of Federal Claims or vice versa. Indeed, decisions of the boards of contract appeals are not binding on the Court of Federal Claims. See Gen. Elec. Co., Aerospace Group v. United States, 929 F.2d 679, 682 (Fed. Cir. 1991) (stating that the decision of a board of contract appeals that was "confronted with the same issue" was not binding on the Court of Federal Claims or the Federal Circuit); see also Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1584 (Fed. Cir. 1994) (noting that the a decision of a board of contract appeals was not binding on the Federal Circuit). In sum, the court concludes that defendant has incorrectly interpreted the Federal Circuit's reference to "jurisdictional parity" as limiting the jurisdiction of the Court of Federal Claims to the jurisdiction asserted by the boards of contract appeals in its decisional law.

Furthermore, the court finds the cases from the Armed Services Board of Contract Appeals ("Board") cited by defendant, all of which stem from the Board's decision in Konoike Construction Co., ASBCA No. 40910, 91-3 BCA ¶ 24,170 (1991), to be unpersuasive. Unlike in the instant case, in which plaintiff is appealing the purported denial of a claim concerning a performance evaluation, the contractor in Konoike Construction Co. appealed the adverse performance evaluation itself. Id. In particular, the contractor claimed that "the rendering of an unsatisfactory performance evaluation [w]as, in essence, a Government claim against the contractor" and that the contracting officer's "performance evaluation was a final decision within the purview of the CDA . . . ." Id. The government argued that the Board lacked jurisdiction over the contractor's appeal because "a performance evaluation is not a 'final decision' pursuant to the claim provisions of the [CDA]." Id. The Board agreed with the government and held:

> [The contract's Disputes Clause] recognizes three distinct types of 'claims[]': those seeking, as a matter of right, (1) the payment of money in a sum certain, (2) the adjustment or interpretation of contract terms, or (3) other relief arising under or relating to the contract. . . .
>
> . . . The Government's performance evaluation does not fall within any of the three categories of claims contemplated by the Disputes Clause. As there is no claim underlying this appeal, the Board does not have jurisdiction. We likewise conclude that there is no claim of appellant.

Id. (citations omitted). In short, the Board's narrow holding in Konoike Construction Co. reflected its view that a performance evaluation, standing alone, did not constitute a claim. The

Board properly limited its decision to the facts of the case and did not speculate as to whether a contractor's response to a performance evaluation could constitute a valid claim.[16]

Yet, four months later, when the Board was confronted with an appeal from a contracting officer's decision that specifically rejected a contractor's claim for an amended performance evaluation, it relied entirely on the holding of Konoike Construction Co.  In G. Bliudzius Contractors, Inc., the contractor received an adverse performance evaluation and subsequently submitted a claim to the contracting officer seeking a change in its rating.  ASBCA No. 42365, 92-1 BCA ¶ 24,605 (1991).  The contracting officer issued a decision denying the contractor's request.  Id.  The contractor appealed the contracting officer's decision to the Board, but the Board, citing Konoike Construction Co., concluded that a contractor's "request that the contracting officer change the evaluation [is not] a contractor claim."  Id.  The Board did not explain the basis upon which it was expanding the holding in Konoike Construction Co.  Similarly, in TLT Construction Corp., the contracting officer issued an adverse performance evaluation, which the contractor unsuccessfully appealed to the District Engineer.  ASBCA No. 53769, 02-2 BCA ¶ 31,969 (2002).  The contractor "filed an appeal to [the] Board of the Government's negative assessment of appellant's work and sought to have that evaluation corrected."  Id.  The Board, citing only Konoike Construction Co. and G. Bliudzius Contractors, Inc., held that it lacked "jurisdiction to adjudicate such appeals" because "[a] performance evaluation under a contract is an administrative matter not a Government claim, and a contractor's request that a contracting officer change an evaluation is not a contractor claim."  Id.

The court declines to adopt the Board's reasoning in this line of cases.  In Konoike Construction Co., the contractor appealed the actual performance evaluation without first submitting a "claim," i.e., without first disputing the evaluation to the contracting officer.  Indeed, the Board does not suggest that the contractor sought to present a claim to the contracting officer that was separate and distinct from the performance evaluation.  Thus, the Board's decision in Konoike Construction Co. concerned only whether the performance evaluation, standing alone, constituted a claim immediately appealable to the Board pursuant to the CDA.  Accordingly, the court views the Board's holdings in G. Bliudzius Contractors, Inc. and TLT Construction Corp. that a contractor's request to the contracting officer to change a performance evaluation is not a valid CDA claim as unwarranted extensions of its rationale in Konoike Construction Co.

Finally, allowing a contractor to challenge a performance evaluation in the Court of Federal Claims is in complete harmony with the overall jurisdictional scheme fashioned by Congress in enacting and amending the Tucker Act.  Congress enacted the Tucker Act in 1887,

---

[16]  The Board did provide: "We likewise conclude that there is no claim of appellant." The use of the word "likewise" indicates that the Board was concluding that the performance evaluation was not a contractor claim.  There is no indication that the Board was referring to the contractor's responses, if any, to the performance evaluation.  See Konoike Constr. Co., 91-3 BCA ¶ 24,170.

providing that the Court of Claims had jurisdiction over "[a]ll claims founded upon the Constitution of the United States or any law of Congress, . . . or upon any regulation of an Executive Department, or upon any contract, expressed or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort . . . ." Tucker Act, ch. 359, § 1, 24 Stat. 505 (1887). Although the Tucker Act was amended on numerous occasions over the following eighty years, this basic jurisdictional grant remained intact. See, e.g., Act of July 28, 1953, ch. 253, 67 Stat. 226, 226-27 (clarifying that the court's jurisdiction did not extend to suits concerning the Tennessee Valley Authority); Act of June 25, 1948, ch. 646, 62 Stat. 869, 940 (reformatting, but not altering, the jurisdictional grant upon the codification and enactment of title 28 of the United States Code); Act of Mar. 3, 1911, ch. 231, 36 Stat. 1087, 1136 (leaving the jurisdictional grant unchanged upon the codification and enactment of the laws relating to the judiciary). Then, in the 1970s, Congress amended the Tucker Act on several occasions to expand the court's jurisdiction. See, e.g., Contract Disputes Act of 1978, Pub. L. No. 95-563, § 14(i), 92 Stat. 2383, 2391 (extending the court's jurisdiction to suits arising under the CDA); Act of Aug. 29, 1972, Pub. L. No. 92-415, 86 Stat. 652 (extending the court's jurisdiction to allow it to award certain nonmonetary relief "incident of and collateral to" judgments for money damages); Act of July 23, 1970, Pub. L. No. 91-350, 84 Stat. 449 (extending the court's jurisdiction to suits concerning contracts with certain nonappropriated fund instrumentalities).

Congress continued to expand the jurisdiction of the court in the 1980s and beyond. In 1982, Congress amended the Tucker Act to provide the then-newly created United States Claims Court–the direct predecessor of the Court of Federal Claims–with jurisdiction over "contract claim[s] brought before the contract is awarded"; in other words, over preaward bid protests. Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, § 133, 96 Stat. 25, 39-40. Then, in enacting the Administrative Dispute Resolution Act of 1996 ("ADRA"), Congress extended the bid protest jurisdiction of the court to protests lodged after contract award. Pub. L. No. 104-320, § 12(a), 110 Stat. 3870, 3874-75. By operation of the ADRA's sunset provision in 2001, the Court of Federal Claims became the exclusive judicial forum for all bid protests. Id. § 12(d), 110 Stat. at 3875.

Today, the Court of Federal Claims possesses jurisdiction to entertain both contract award-related protests and contract performance-related claims. The fact that the court entertains both types of actions allows it to render decisions with an eye towards the overall government contracting process. See, e.g., Robert S. Metzger & Daniel A. Lyons, A Critical Reassessment of the GAO Bid-Protest Mechanism, 2007 Wis. L. Rev. 1225, 1237 ("[T]he [Court of Federal Claims]'s unique jurisdiction over both contract-award protests and contract-performance disputes gives it a unique perspective, allowing principles from one area of procurement law to inform its decisions in the other."); Joshua I. Schwartz, Public Contracts Specialization as a Rationale for the Court of Federal Claims, 71 Geo. Wash. L. Rev. 863, 870 (2003) ("The ability of the [Federal Circuit] to bring to bear a lucid understanding of the integrated functioning of the system of government contracts law enabled it to discern a principled relationship between strands of contract formation doctrine and a key aspect of contract performance law. A court that

-16-

has jurisdiction over contract formation disputes and contract performance disputes is uniquely situated to engage in this kind of analysis.").

In the instant case, plaintiff was faced with two options.  It could either attempt to challenge an allegedly unfair and inaccurate performance evaluation as a contract-performance claim pursuant to the CDA at the time the Air Force issued the performance evaluation or it could wait and lodge a protest when the performance evaluation played a role in an unsuccessful bid on a future contract.  While both options are legally viable, only one makes sense when examining the government procurement process as a whole.  To begin, it is important to note that Congress has endeavored over the years to make government contracting more efficient.  See, e.g., PGBA, LLC v. United States, 389 F.3d 1219, 1227 (Fed. Cir. 2004) (remarking that "the ADRA 'is designed to increase the efficiency of our procurement system by consolidating jurisdiction over bid protest claims in the Court of Federal Claims'" (quoting 142 Cong. Rec. S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen))); Reflectone, Inc., 60 F.3d at 1580 (noting that the CDA was to "provid[e] for the efficient and fair resolution of contract claims" (citing S. Rep. No. 95-1118, at 4 (1978), reprinted in 1978 U.S.C.C.A.N. 5235, 5238)); Omega World Travel, Inc. v. United States, 82 Fed. Cl. 452, 462 (2008) (asserting that the "'revised contracting procedures and the new, accelerated notice of contract awards, contract debriefings, and bid protest'" included in the Federal Acquisition Streamlining Act of 1994 were "'all designed to reduce staff time, lessen the amount of paperwork required, and shrink the bureaucracy'" (quoting 140 Cong. Rec. H9245 (daily ed. Sept. 20, 1994) (statement of Rep. Harman))); Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. 239, 254 (1999) (noting that the Competition in Contracting Act sought "to make government contracting more efficient"); Concept Automation, Inc. v. United States, 41 Fed. Cl. 361, 366 (1998) (stating that the bid protest process was designed, in part, to make "government procurement both more fair and more efficient").  The efficiency of the procurement process would be compromised by forcing a contractor to protest an issue that could have been resolved at an earlier time under the CDA.  Indeed, to force a wrongly evaluated contractor to defer a challenge to the evaluation until it unsuccessfully bids on a future contract is not only inefficient, but is potentially unfair.  The contractor would be tethered to the inaccurate performance evaluation for an unspecified–possibly lengthy–period of time.  It is conceivable that by the time the contractor was able to challenge the evaluation, personnel changes and fading memories could hinder the contractor's chances for success.  These two factors could be particularly fatal to a contractor's challenge given the heavy burden faced by unsuccessful bidders challenging contract awards.  See Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (noting that the unsuccessful bidder–whose protest concerned an agency's past performance determination–was required to establish that it was "significantly prejudiced" by the agency's error).  Thus, it is imperative to quickly address and correct an erroneous performance evaluation.

Further, there is no question that bid protests can greatly disrupt the government procurement process.  See Vernon J. Edwards, Postscript: Breach of Loss of the Fair Opportunity to Compete, 20 No. 12 Nash & Cibinic Rep. ¶ 59 (2006) ("Protests are highly disruptive to Government operations.").  At the same time, CDA claims are typically nondisruptive.  See id.

("Claims do not disrupt ongoing operations because under the CDA, a . . . court cannot suspend . . . performance, issue a temporary restraining order, or provide injunctive relief."). Accordingly, challenges to performance evaluations are best made within the confines of the CDA, thus allowing the contractor and the government to avoid unnecessary and disruptive bid protests.

In sum, a contractor's claim requesting a change to a performance evaluation is not a meaningless act. To the contrary, such a claim is a proper mechanism, and provides the proper jurisdictional predicate, to challenge an adverse performance evaluation in the Court of Federal Claims.

**B.  Because the Contracting Officer Did Not Issue a Valid Final Decision, Plaintiff's Claim Is Deemed Denied**

Because the court has concluded that plaintiff presented a valid claim to the contracting officer, the next question before the court is whether the contracting officer issued a valid final decision on that claim. As noted above, a contracting officer must issue a decision on a contractor's claim "within a reasonable time." 41 U.S.C. § 605(c)(3). The decision must be in writing, "shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this chapter." Id. § 605(a); accord 48 C.F.R. § 33.211. However, the decision need not contain "the standard language announcing that it constitutes a final decision," Alliant Techsys., Inc., 178 F.3d at 1267, or the "boilerplate language usually present for the protection of the contractor," Placeway Constr. Corp. v. United States, 920 F.2d 903, 907 (Fed. Cir. 1990).

Here, plaintiff asserts that the Air Force's issuance of the final CPAR on February 7, 2007, constituted a final decision on its claim seeking a fair and accurate CPAR. Opp'n 10-11. Defendant does not agree, arguing that because the final CPAR "was not conducted in response to the provisions of the contract, . . . the CPAR inherently will not reflect any characteristic of a contracting officer final decision." Mot. 9; accord Reply 7. Once again, defendant's insistence that plaintiff's claim must have some explicit foundation in the contract is misplaced. However, there is no question that the final CPAR bears little resemblance to a typical contracting officer's final decision. First, although the Air Force impliedly rejected plaintiff's claims that the CPAR was unfair and inaccurate by issuing the final CPAR without any relevant changes, the Air Force did not expressly "state the reasons for the decision reached" or "inform the contractor of his rights . . . ." See id. § 605(a). Nonetheless, the Federal Circuit has held that the failure to include such language should not preclude a written instrument from being considered a final decision. Alliant Techsys., Inc., 178 F.3d at 1267; Placeway Constr. Corp., 920 F.2d at 907. Given this binding Federal Circuit precedent, the court cannot say that the final CPAR did not contain the language necessary to constitute a final decision. More problematic than the language of the final CPAR, however, is that plaintiff does not allege that the final CPAR was issued by the contracting officer. See Compl. ¶ 49 ("[T]he Air Force issued a final CPAR . . . ."). Instead, the evidence suggests that the Reviewing Official, and not the Assessing Official/contracting officer,

-18-

was the individual responsible for issuing the final CPAR.[17]  Def.'s Br. 2-3; Attach. 1 at 10.
Thus, the court concludes that the contracting officer did not issue a final decision.

The lack of a final decision from the contracting officer, however, is not fatal to
plaintiff's case.  Pursuant to the CDA, if a contracting officer fails to issue a decision "within the
period required," which here is "a reasonable time," the failure is deemed to be a decision
denying the claim.  41 U.S.C. § 605(c)(3), (5).  Plaintiff made its claim to the contracting officer
for a fair and accurate CPAR on January 12, 2007, and the contracting officer, more than twenty-
two months later, has failed to issue a final decision in conformance with 41 U.S.C. § 605(a).
Because twenty-two months exceeds the length of time that the court considers "reasonable" for
the contracting officer to issue a decision in this case, the court deems the claim denied by
operation of 41 U.S.C. § 605(c)(5), which allows plaintiff to pursue the instant appeal.

## IV.  CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DENIES IN PART**
defendant's motion to dismiss.  The parties are directed to proceed in accordance with the RCFC.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[17]  Plaintiff argues that the Reviewing Official was the immediate supervisor of the
contracting officer, Opp'n 5, 11, but does not make such allegations in its complaint or provide
any documentary evidence in support of its contention.  The court cannot accept attorney
argument as fact.  See Enzo Biochem, Inc. v. Gen-Probe, Inc., 424 F.3d 1276, 1284 (Fed. Cir.
2005) ("Attorney argument is no substitute for evidence."); Mel Williamson, Inc. v. United
States, 229 Ct. Cl. 846, 848 (1982) ("Argument is not fact."); Del., Lackawanna & W. R.R. Co.
v. United States, 54 Ct. Cl. 35, 41-42 (1919) ("The court can not accept asseverations of counsel,
as to facts, made in argument, whether denied or conceded by the other side at the bar, without
any stipulation duly filed or other evidence . . . .").