# In the United States Court of Federal Claims

No. 07-579C
(Filed: August 16, 2010)

| | | |
|---|---|---|
| *************************************** | | |
| BLR GROUP OF AMERICA, INC., | * | |
| | * | |
| Plaintiff, | * | Mootness; Reconsideration; Jurisdiction; |
| | * | Contract Disputes Act of 1978, 41 U.S.C. |
| v. | * | §§ 601-613; Performance Evaluation; |
| | * | Definition of Claim; Contracting Officer's |
| THE UNITED STATES, | * | Decision; Deemed Denial |
| | * | |
| Defendant. | * | |
| *************************************** | | |

Timothy F. Noelker, St. Louis, MO, for plaintiff.

William P. Rayel, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff in the above-captioned case alleges that government personnel prepared and disseminated an unfair and inaccurate evaluation of its performance under a contract with the United States Air Force ("Air Force") and requests appropriate nonmonetary relief. In a previous decision, the court determined that it possessed jurisdiction over one of plaintiff's claims. Now before the court are defendant's motion for partial reconsideration of that prior decision, motion for summary judgment on plaintiff's remaining claim, and motion to dismiss on mootness grounds. For the reasons set forth below, the court dismisses plaintiff's remaining claim for lack of jurisdiction.

## I. BACKGROUND[1]

Plaintiff BLR Group of America, Inc. is a Texas corporation that provides support services for airline, general aviation, military, technology, and government clients. Compl. ¶¶ 3, 7. On April 14, 2006, the Air Force awarded plaintiff a contract "to provide Air Traffic Management support services to the Directorate of Communications and Information's Air Traffic Management Systems Office (AMC/A67)." Id. ¶ 8. In particular, plaintiff was required "to provide 'functional, technical liaison, and analytical support' in accordance with the Performance Work Statement," which identified a variety of required and discretionary tasks. Id. ¶ 9 (quoting the contract). The contract was awarded for one base year and four subsequent option years "on a firm fixed-price basis, with some cost-reimbursable items." Id. The total contract award amount was $564,968. Def.'s App. 3.

In the contract, the Air Force identified the individuals responsible for contract administration. Pl.'s Ex. 35-36. Nancy Kreke was named as the contracting officer. Id. at 36. Jo A. Brown-Leiker was named as the lead Quality Assurance Personnel ("QAP"), whose responsibilities included "performing technical, administration, inspection, and acceptance of services" provided under the contract. Id.

Prior to contract award, plaintiff hired a subcontractor, John Hoffman, to serve as its chief engineer. Id. at 1. "During contract performance, [plaintiff's] personnel observed an inappropriately close personal relationship" between Mr. Hoffman and the lead QAP, Ms. Brown-Leiker. Compl. ¶ 13. In early June 2006, plaintiff questioned some of the bills it received from the Mr. Hoffman. Id. ¶ 14. On June 8, 2006, less than two months after contract award, Mr. Hoffman "abruptly terminated his relationship with [plaintiff] and his work under the Contract and subcontract." Id. ¶ 15. Plaintiff's "relationship with the Air Force quickly deteriorated following Mr. Hoffman's departure." Pl.'s Ex. 2. In particular, plaintiff contends that Ms. Brown-Leiker "became completely uncooperative," in that she "immediately began to hinder [plaintiff]'s performance by imposing unreasonable requirements, suddenly becoming unavailable to [plaintiff's] representatives, and by unreasonably monitoring and evaluating [plaintiff]'s performance." Id. at 3. Ultimately, on September 26, 2006, the Air Force terminated the contract for its convenience. Compl. ¶ 36.

After the contract's termination, the Air Force evaluated plaintiff's performance under the contract in a Contractor Performance Assessment Report ("CPAR"). Id. ¶ 42. "The primary purpose of the [Contractor Performance Assessment Reporting System] is to ensure that accurate

---

[1] The court derives the facts from plaintiff's complaint ("Compl."), the appendix to Defendant's Motion for Partial Reconsideration or, in the Alternative, Motion for Summary Judgment ("Def.'s App."), the exhibits attached to BLR Group's Memorandum in Opposition to Defendant's Motion for Partial Reconsideration and Alternative Motion for Summary Judgment ("Pl.'s Ex."), the attachment to Defendant's Motion to Dismiss ("Def.'s Ex."), and its November 25, 2008 Opinion and Order.

data on contractor performance is current and available for use in source selections . . . ." Def.'s App. 22. Due to the importance of CPARs in the source selection process and its belief that Ms. Brown-Leiker lacked objectivity with respect to its contract performance, plaintiff requested, four days before the Air Force terminated the contract for its convenience, that another QAP be assigned to the contract. Compl. ¶¶ 38-40. The Air Force did not respond to plaintiff's request. Id. ¶ 41. Instead, upon the contract's termination, Ms. Brown-Leiker and the alternate QAP prepared plaintiff's CPAR. Def.'s App. 17. The contracting officer, Ms. Kreke, in her role as Assessing Official,[2] signed the CPAR on November 21, 2006. Id. at 15. That same day, via an electronic mail message, she notified plaintiff that a CPAR had been prepared and was ready for plaintiff's review. Compl. ¶ 42; Pl.'s Ex. 82-83.

In the CPAR, the Air Force rated plaintiff's performance as "marginal" for four evaluation criteria: (1) Quality of Product or Service; (2) Schedule; (3) Business Relations; and (4) Management of Key Personnel. Def.'s App. 14. According to plaintiff, the narrative in the CPAR "was replete with misrepresentations and inaccuracies." Compl. ¶ 44. Thus, pursuant to the guidelines set forth in the November 21, 2006 electronic mail notification message, plaintiff requested a meeting with the Air Force to discuss the CPAR. Pl.'s Ex. 78, 83. The meeting was initially scheduled for December 6, 2006, id. at 85, but was postponed after an electronic mail message from the Reviewing Official, Eric Hassenplug, led plaintiff to believe that the purpose of the meeting had changed, id. at 78. The meeting ultimately occurred on January 9, 2007, and included the following participants: plaintiff, Ms. Kreke, Ms. Brown-Leiker, and other Air Force personnel. Compl. ¶ 46. During the meeting, plaintiff provided substantive rebuttals to many of the items in the CPAR and requested information from the Air Force concerning how it prepared the CPAR. Id. The Air Force did not provide plaintiff with the information it sought, id., but Ms. Kreke invited plaintiff to submit written questions, id. ¶ 47. Plaintiff submitted written questions, but received no response. Id.

On January 12, 2007, plaintiff submitted written comments in response to the CPAR. Def.'s App. 15. The comments concerned both the inaccuracies contained in the CPAR and the possible biases of one of the preparers of the CPAR, Ms. Brown-Leiker. Id. at 15, 17-20. At the conclusion of its comments, plaintiff indicated that it did not concur with the unfavorable assessment of its performance and requested that its performance be reevaluated. Id. at 20. Because plaintiff disagreed with the Air Force's unfavorable assessment, the CPAR could not be finalized until Mr. Hassenplug reviewed it. BLR Group of Am., Inc., 84 Fed. Cl. at 637. Mr. Hassenplug reviewed the CPAR, including plaintiff's comments, on February 6, 2007, and determined that the "marginal" ratings were appropriate.[3] Def.'s App. 1. Although the final

---

[2] The Assessing Official is responsible for, among other things, reviewing the evaluation narrative prepared by her representatives. BLR Group of Am., Inc. v. United States, 84 Fed. Cl. 634, 636 (2008).

[3] In a declaration submitted as part of defendant's appendix, Mr. Hassenplug states that he "submitted comments on the performance evaluation" and that the CPAR includes his

CPAR contained "one modification to the Management of Key Personnel section," it "reflected no substantive modification to the original CPAR." Compl. ¶ 49

The final CPAR was disseminated to other procurement officials via the Past Performance Information Retrieval System ("PPIRS"), which is managed by the Naval Sea Logistics Center. Id. ¶¶ 4, 51; see also Def. App. 22 (indicating that CPARs are "for use in source selections through the Past Performance Informational Retrieval System"). Plaintiff objected to how the CPAR was displayed in the PPIRS and requested that Mr. Hassenplug take corrective action. Compl. ¶ 54. The government refused plaintiff's request. Id.

Given the government's refusal to amend the CPAR and correct the PPIRS display, plaintiff filed a complaint in this court on August 1, 2007, asserting two claims and seeking declaratory and injunctive relief. In its first claim for relief, plaintiff requested that the court "direct the Air Force to revise the CPAR to make it fair and accurate and consistent with the facts, or, alternatively, to rescind the CPAR in its entirety." Id. ¶ 57. In its second claim for relief, plaintiff requested that the court direct the Air Force and the Naval Sea Logistics Center to revise or rescind the PPIRS version of the CPAR. Id. ¶ 60. Defendant moved to dismiss plaintiff's complaint for lack of jurisdiction. In a November 25, 2008 decision, the court concluded that it possessed jurisdiction to entertain plaintiff's first, but not its second, claim for relief. Subsequently, in October 2009, pursuant to standard practice, plaintiff's CPAR was removed from the PPIRS and archived, rendering it unavailable for viewing in connection with future source selection decisions. Def.'s Ex. 1-2. Defendant now seeks reconsideration of the court's finding of jurisdiction, dismissal of plaintiff's complaint on mootness grounds, or, in the alternative, summary judgment in its favor. The court heard argument on August 11, 2010.

## II.  MOTION TO DISMISS

Defendant first moves to dismiss plaintiff's complaint on justiciability grounds, contending that the removal of plaintiff's CPAR from the PPIRS renders plaintiff's case moot. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969). When a case is moot, there are no justiciable issues upon which the court can render a decision.[4] Flast v.

---

"comments as the reviewing official." Def.'s App. 2. However, the CPAR provided to the court contains no comments from Mr. Hassenplug. Id. at 15. Indeed, Mr. Hassenplug's name and contract information are omitted from the relevant portion of the CPAR. Id. Thus, it is unclear precisely what comments were made by Mr. Hassenplug.

[4] The "lack of jurisdiction to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." Liner v. Jafco, Inc., 375 U.S. 301, 306 n.3 (1964); see also U.S. Const. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties . . . [and] to Controversies to which the

Cohen, 392 U.S. 83, 95 (1968); see also Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005) (panel portion) (noting that justiciability "encompasses a number of doctrines under which courts will decline to hear and decide a cause," including the "doctrines of standing, mootness, ripeness, and political question").  The court's inquiry into the justiciability of a case is distinct from its inquiry into whether it has jurisdiction over the case's subject matter.  Powell, 395 U.S. at 512; Baker v. Carr, 369 U.S. 186, 198 (1962); Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993).  Thus, the court may find that it possesses jurisdiction over the subject matter of a case but that the dispute is nevertheless nonjusticiable.

Here, defendant raises its mootness argument in a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  While there is authority indicating that a nonjusticiable case is properly dismissed pursuant to RCFC 12(b)(1), there also is authority to support the view that a dismissal on justiciability grounds is a dismissal on the merits.[5]  Because the court concludes that

_____

United States shall be a Party . . . .").  But see Honig v. Doe, 484 U.S. 305, 329-32 (1988) (Rehnquist, C.J., concurring) (questioning the constitutional origins of the mootness doctrine by arguing that despite the federal courts' recognition of exceptions to mootness, such exceptions cannot be read into Article III's case or controversy requirement); Matthew I. Hall, The Partially Prudential Doctrine of Mootness, 77 Geo. Wash. L. Rev. 562, 575 (2009) (arguing "that if the mootness bar were truly a mandatory, jurisdictional rule imposed by the Constitution, then the exceptions . . . could not exist").  The United States Court of Federal Claims ("Court of Federal Claims"), as a court established under Article I of the United States Constitution, 28 U.S.C. § 171(a) (2006), is not bound by the "case or controversy" requirement of Article III, Zevalkink v. Brown, 102 F.3d 1236, 1243 (Fed. Cir. 1996).  Nevertheless, the Court of Federal Claims and other Article I courts traditionally have applied the "case or controversy" justiciability doctrines in their cases for prudential reasons.  See id.; Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003); CW Gov't Travel, Inc. v. United States, 46 Fed. Cl. 554, 558 (2000).

[5] Compare Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-10 (1988) (characterizing standing as a jurisdictional issue), North Carolina v. Rice, 404 U.S. 244, 246 (1971) (per curiam) ("Mootness is a jurisdictional question because the Court is not empowered to decide moot questions or abstract propositions . . . ." (internal quotation marks omitted)), Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[M]ootness . . . is a threshold jurisdictional issue."), and Tech. Innovation, Inc. v. United States, No. 09-784C, 2010 WL 2132741, at *1 (Fed. Cl. May 18, 2010) ("The mootness of a case is properly the subject of an RCFC 12(b)(1) motion."), with Baker, 369 U.S. at 196 (holding that a court's determination that a case is "unsuited to judicial inquiry or adjustment . . . result[s] in a failure to state a justiciable cause of action" and not a lack of subject matter jurisdiction), United States v. Cotton, 535 U.S. 625, 630 (2002) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." (emphasis added)), Oryszak v. Sullivan, 576 F.3d 522, 526-27 (D.C. Cir. 2009) (Ginsburg, J., concurring) (noting that when "a plaintiff makes a claim that is not justiciable . . . a court should dismiss the case for failure to

plaintiff's case is not moot, the court need not address the proper basis of defendant's motion to dismiss.

## A.  The Mootness Doctrine

A court "will determine only actual matters in controversy essential to the decision of the particular case before it."  United States v. Alaska S.S. Co., 253 U.S. 113, 115 (1920).  "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests."  Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240-41 (1937).  Moreover, the controversy must exist at all stages of the litigation; it is not enough that the controversy was alive when the complaint was filed.  Steffel v. Thompson, 415 U.S. 452, 459 n.10 (1974).  Because the "[m]ootness of an action relates to the basic dispute between the parties" and "not merely the relief requested," a case will not be rendered moot by subsequent acts if some of the requested relief remains available.  Intrepid v. Pollock, 907 F.2d 1125, 1131 (Fed. Cir. 1990); accord Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (holding that a case is not moot so long as the "court can fashion some form of meaningful relief" for the injured party).

However, even when subsequent acts render a case completely moot, courts will allow the case to proceed under certain circumstances.  First, an otherwise moot case will not be dismissed upon the voluntary cessation of the challenged activity unless there is no reasonable expectation that the activity will recur and the effects of the activity have been completely extinguished.  County of L.A. v. Davis, 440 U.S. 625, 631 (1979).  Second, a case facing dismissal on mootness grounds will survive if a class is certified "prior to expiration of the named plaintiff's personal claim."  U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 398 (1980).  Third, a moot case will escape dismissal if the challenged action is capable of repetition but evades review, i.e., if "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again."  Weinstein v. Bradford, 423 U.S. 147, 149 (1975); see also Honig, 484 U.S. at 318 (indicating that the second prong of the exception requires a showing that there is a "reasonable likelihood" that the complaining party "will again suffer" the effects of the challenged action).

---

state a claim" and that "it is important to distinguish among failure to state a claim, a claim that is not justiciable, and a claim over which the court lacks subject matter jurisdiction"), and F. Alderete Gen. Contractors, Inc. v. United States, 715 F.2d 1476, 1480 (Fed. Cir. 1983) (reciting "the long-standing rule in the Federal courts that jurisdiction is determined at the time the suit is filed and, after vesting, cannot be ousted by subsequent events, including action by the parties" (emphasis added)).

## B. Plaintiff's First Claim for Relief Is Not Moot

Defendant advances two reasons why the court should declare this case moot. First, it contends that the case is moot because a provision of the Federal Acquisition Regulation ("FAR") prohibits source selection officials from considering a performance evaluation if more than three years have passed since the contractor completed performance on the relevant contract. It then asserts that the case is moot because plaintiff's CPAR was removed from the PPIRS. The court finds neither argument persuasive.

The FAR provision that defendant relies upon–FAR § 42.1503(e)–appears in subpart 42.15, Contractor Performance Information. Until July 1, 2009, it provided: "The past performance information shall not be retained to provide source selection information for longer than three years after completion of contract performance." 48 C.F.R. § 42.1503(e) (2005). It was subsequently amended to read: "Agencies shall use the past performance information in PPIRS that is within three years . . . of the completion of performance of the evaluated contract or order." 48 C.F.R. § 42.1503(e) (2009). According to defendant, this regulation prohibits source selection officials from considering plaintiff's CPAR during future procurements because plaintiff's performance under its contract with the Air Force ended more than three years ago.[6] However, the plain language of the provision, both before and after amendment, contradicts defendant's interpretation. The old version of the rule prohibited evaluating agencies from retaining past performance information beyond a certain period of time, but provided no guidance to procuring agencies. The current version of the rule requires procuring agencies to use past performance information in the PPIRS if it relates to a contract where performance was completed within the last three years, but does not prohibit a procuring agency from considering additional information.[7] Neither version can be read to prohibit a procuring agency from

---

[6] Defendant cites a decision of the Comptroller General, <u>D.F. Zee's Fire Fighter Catering</u>, in support of this interpretation. In that decision, however, the Comptroller General did not address whether the procuring agency could consider past performance information that was more than three years old. 99-2 CPD ¶ 62 (1999). Rather, the issue was whether the three-year period described in the regulation ran from the date a particular aspect of contract performance was completed or from the date that contract performance as a whole was completed. <u>Id.</u> More on point is <u>Oregon Iron Works, Inc.</u>, in which the Comptroller General specifically rejected the contention that FAR § 42.1503(e) "establishes a blanket prohibition precluding source selection officials from considering any past performance information for contracts completed more than 3 years prior to the source selection . . . ." 2000 CPD ¶ 119 (2000).

[7] In the supplementary information appended to the Final Rule published in the Federal Register, the government explained that the amendment to FAR § 42.1503(e) was meant "to clarify" that the provision "deals with retention of past performance information rather than required procedures to be utilized in a source selection." Contractor Performance Information, 74 Fed. Reg. 31,557, 31,559 (July 1, 2009); <u>see also id.</u> at 31,558 ("The intent of this language is to ensure that past performance data is current and relevant. The use of the past performance

obtaining or considering the past performance information contained in plaintiff's CPAR, even if that information no longer appears in the PPIRS.  See also 74 Fed. Reg. at 31,558 (noting that past performance information is "part of the official contract file and must be retained" regardless of whether the information has been removed from the PPIRS).

The court's interpretation of the plain language of FAR § 42.1503(e) is reinforced by another provision of the FAR that appears in subpart 15.3, Source Selection: FAR § 15.305(a)(2). Pursuant to this provision, procuring agencies "shall provide offerors an opportunity to identify past or current contracts . . . for efforts similar to the Government requirement," along with information describing any problems encountered and corrective action taken on those contracts. 48 C.F.R. § 15.305(a)(2)(ii) (2005).  Procuring agencies are not limited to requesting information concerning a certain number of contracts or concerning contracts of a particular age.[8]  Nor are they limited to obtaining past performance information directly from offerors.  See id. (providing that the procuring agency "shall consider" the information provided by offerors, "as well as

_____

information that may be obtained from PPIRS for acquisition evaluations is limited to the 3-year timeframe . . . .").  Regardless of whether the amendment achieved its stated purpose, there is no question that the amended provision does not limit source selection officials in the manner contemplated by defendant.

[8]  Indeed, there are numerous examples in the case law of agencies requesting information about contracts completed within the previous five-year period. See, e.g., Westech Int'l, Inc. v. United States, 79 Fed. Cl. 272, 276 (2007) ("[T]he solicitation required an offeror to include information regarding its past performance for contracts completed or in process during the last five years . . . ."); Dubinsky v. United States, 43 Fed. Cl. 243, 246 (1999) ("Past Performance will be evaluated to ensure the offeror has performed similar work, with a similar project magnitude for the past five (5) years . . . ." (internal quotation marks omitted)); Lockheed Martin MS2 Tactical Sys., 2008 CPD ¶ 157 (2008) ("In furtherance of the past performance evaluation, offerors were required to identify contracts whose performance is within five years from the [Request for Proposals] release . . . ." (internal quotation marks omitted)); ITT Indus. Space Sys., LLC, 2007 CPD ¶ 217 (2007) ("For the purpose of evaluating offerors' past performance, the solicitation instructed offerors to provide information concerning all relevant contracts and subcontracts that they . . . had completed with in the past 5 years."); STG, Inc., 2006 CPD ¶ 166 (2006) ("The [Request for Proposals] directed offerors to submit past performance information concerning their performance of recent (within the past 5 years) and relevant contracts and subcontracts."); IPlus, Inc., 2006 CPD ¶ 90 (2006) ("For past performance, offerors were required to describe performance on similar contracts it has [sic] held with the last five (5) years . . . ." (internal quotation marks omitted)); Poly-Pac. Techs. Inc., 2006 CPD ¶ 21 (2006) ("In order to facilitate past performance evaluation, the [Request for Proposals] stated that proposals were to include information on the number of contracts held, contract number, contract period, description of material an[d] work performed, contract dollar value, and point of contact and telephone number regarding contracts awarded to the contractor within the prior five (5) years." (internal quotation marks omitted)).

information obtained from any other sources"). Rather, a procuring agency must consider "[t]he currency and relevance of the information, source of the information, context of the data, and general trends in [the] contractor's performance . . . ." Id. § 15.305(a)(2)(I); see also Vantage Assocs., Inc. v. United States, 59 Fed. Cl. 1, 22 (2003) (noting that procuring agencies have broad discretion in evaluating offerors' past performance, including the determination of which references should be reviewed).

Taken in concert, these FAR provisions support plaintiff's position that the CPAR's "availability to all government procurement officials . . . has the potential to substantially damage [its] business reputation," Compl. ¶ 56, describes a redressable injury. A procuring agency may request information from plaintiff concerning its contract with the Air Force even though plaintiff completed its performance more than three years ago and even though the CPAR at issue no longer appears on the PPIRS. Because plaintiff retains "a legally cognizable interest in the outcome," Powell, 395 U.S. at 496, its case is not moot.[9] Thus, the court turns defendant's motion for partial reconsideration.

## III. MOTION FOR PARTIAL RECONSIDERATION

### A. Standard of Review

As noted above, the court held in its November 25, 2008 decision that it possessed jurisdiction to entertain plaintiff's first claim for relief. Defendant moves, pursuant to RCFC 59, for reconsideration of that ruling, raising new jurisdictional arguments in support of dismissal.[10] As a general rule, the court will not grant an RCFC 59 motion for reconsideration unless there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice. See Bd. of Trs. of Bay Med. Ctr. v. Humana Military Healthcare Servs., Inc., 447 F.3d 1370, 1377 (Fed. Cir. 2006); Fla. Power & Light Co. v. United States, 66 Fed. Cl. 93, 96 (2005). However, in this case, defendant is challenging the court's exercise of jurisdiction. Because the parties or the court may assert a lack of jurisdiction at any time during the proceedings, Arbaugh v. Y & H Corp., 546 U.S. 500, 506

---

[9] Because the court concludes that plaintiff's case is not moot, it need not determine whether the "capable of repetition, yet evading review" exception to the mootness doctrine is applicable, as plaintiff contends.

[10] Because defendant's new arguments are jurisdictional in nature, the court does not consider them to be waived. See Bluebonnet Sav. Bank, F.S.B. v. United States, 466 F.3d 1349, 1361 (Fed. Cir. 2006) ("[A]n argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived and not preserved for appeal."); Four Rivers Invs., Inc. v. United States, 78 Fed. Cl. 662, 665 (2007) (concluding that the plaintiff's new arguments, including "new arguments based on a different interpretation of the facts alleged" in the case, did not "constitute grounds for reconsideration of the court's opinion").

(2006), the stringent standards under which the court considers RCFC 59 motions are inapposite here.  Instead, the court treats defendant's motion as a motion to dismiss for lack of jurisdiction.[11]

## 1.  Motion to Dismiss

In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor.  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  However, plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction.  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction.  Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974); Reynolds, 846 F.2d at 747.  If the court concludes that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

## 2.  Jurisdiction Under the Contract Disputes Act of 1978

The ability of the Court of Federal Claims to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).

The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the United States Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2006).  It also waives sovereign immunity for "any claim by or against, or dispute with, a contractor arising under" the Contract Disputes Act of 1978 ("CDA"), Pub. L. No. 95-563, 92 Stat. 2383 (codified as amended at 41 U.S.C. §§ 601-613 (2006)).  28 U.S.C. § 1491(a)(2).

Plaintiff asserts jurisdiction pursuant to 28 U.S.C. § 1491(a)(2), which grants the court jurisdiction over CDA claims.  The CDA provides that if a contractor has a dispute with the government "relating to a contract," the contractor shall make a written claim to the contracting officer.  41 U.S.C. § 605(a).  Pursuant to the FAR, a claim is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to [the] contract."  48 C.F.R. § 52.233-1.  Upon receipt of a claim, the contracting officer

---

[11]  A motion for reconsideration is an inappropriate vehicle in which to raise new arguments contesting the court's jurisdiction.  Thus, the court hereinafter refers to defendant's motion for partial reconsideration as a renewed motion to dismiss for lack of jurisdiction.

is required to issue a decision "within a reasonable time."[12]  41 U.S.C. § 605(c)(3).  The decision must be in writing, "shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in" the CDA.  Id. § 605(a).  If a contracting officer fails to issue a decision "within the period required," the failure is deemed to be a decision denying the claim.  Id. § 605(c)(5).  The decision of the contracting officer is final unless the contractor makes an authorized appeal.  Id. § 605(b).  A contractor may appeal a contracting officer's decision to the Court of Federal Claims.  Id. § 609(a)(1).  The submission of a proper claim, a contracting officer's decision or deemed denial, and a proper appeal are all jurisdictional requirements under the CDA.  See, e.g., England v. Swanson Group, Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004); Scott Timber Co. v. United States, 333 F.3d 1358, 1365-66 (Fed. Cir. 2003); James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541 (Fed. Cir. 1996); Bonneville Assocs. v. United States, 43 F.3d 649, 653 (Fed. Cir. 1994).

## B.  Discussion

In its renewed motion to dismiss, defendant advances four reasons why this court lacks jurisdiction under the CDA to entertain plaintiff's first claim for relief.  The first three reasons concern whether plaintiff submitted a valid claim to the contracting officer, while the fourth reason concerns whether there was a deemed denial by the contracting officer.

### 1.  Plaintiff Asserted Entitlement to Relief as a Matter of Right

Defendant begins its challenge to the court's jurisdiction by revisiting its earlier contention that there is no valid CDA claim because plaintiff is not entitled to a fair and accurate performance evaluation as a matter of right.  In its original motion to dismiss, defendant contended that plaintiff did not request relief as a matter of right in its January 12, 2007 communication with the Assessing Official, i.e., its comments in response to the CPAR.  The court rejected this contention in its November 25, 2008 decision.  Applying Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1265 (Fed. Cir. 1999), the court concluded that plaintiff satisfied the "matter of right" requirement by asserting entitlement to relief with some legal basis; namely, entitlement to a fair and accurate performance evaluation pursuant to FAR § 42.1502(a), which provides that "agencies shall prepare an evaluation of contractor performance for each contract . . . ."[13]  Defendant now contends that although the FAR requires the Air Force to

---

[12]  Because plaintiff seeks nonmonetary relief, the sixty-day time period for the contracting officer's decision specified in 41 U.S.C. § 605(c)(1)-(2) is inapplicable.

[13]  In its motion, defendant asserts that the court held that plaintiff was entitled to a fair and accurate performance evaluation "based upon the FAR and Air Force regulations."  Def.'s Mot. Partial Recons. or, Alternative, Mot. Summ. J. 9.  Defendant's assertion is inaccurate.  Defendant is correct that the court held that FAR § 42.1502(a) entitled plaintiff to a performance evaluation and that, as a logical corollary, FAR § 42.1502(a) entitled plaintiff to a fair and accurate performance evaluation.  See BLR Group of Am., Inc., 84 Fed. Cl. at 640-41.  However,

provide plaintiff with a fair and accurate performance evaluation, plaintiff cannot bring suit for the Air Force's purported violation of the FAR because the requirement of a fair and accurate performance evaluation is primarily for the benefit of the government and not private contractors.

Defendant finds support for its argument in three decisions issued by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") and its predecessor, the United States Court of Claims ("Court of Claims").  In the first of these decisions, Rough Diamond Co. v. United States, the plaintiffs were industrial diamond dealers who entered into agreements with the United States Department of Agriculture ("USDA") to exchange industrial diamonds for surplus cotton owned by the Commodity Credit Corporation.  351 F.2d 636, 637 (Ct. Cl. 1965). The agreements, which were executed by the diamond dealers under protest, specified an exchange rate for the cotton that was higher than the "world market rate" provided by statute.  Id. at 637-38.  Thus, when the USDA refused to apply the statutory exchange rate, the diamond dealers were deprived of the value of the additional cotton that they would have received had the USDA applied the statutory exchange rate.  Id.  Upon considering the diamond dealers' suit, the Court of Claims found that the statute at issue "was designed to benefit American farmers" and not merchants seeking to exchange cotton for other goods, like the diamond dealers.  Id. at 640. Thus, it held that although the diamond dealers were "affected by" the statute, they had no "litigable rights under it," and were accordingly "bound by the traditional rules precluding recovery of monies voluntarily paid to the Government under mistake of law . . . ."  Id. at 642.

Defendant also relies on Cessna Aircraft Co. v. Dalton, in which the contractor alleged that the United States Navy ("Navy") improperly exercised contract options that extended the period of contract performance by three years.  126 F.3d 1442, 1444 (Fed. Cir. 1997).  The contractor performed under the exercised options, after which it sought additional compensation for its work.  Id. at 1445-46.  One of the arguments it advanced in support of its claim for compensation was that the Navy exercised the options in violation of the Antideficiency Act and its implementing regulations.  Id. at 1446, 1450.  In addressing whether the contractor could base its suit on one of the regulations, the Federal Circuit explained:

> The primary intent of a statute or regulation must be to protect or benefit a class of persons in order for that class to be able to bring suit against the government for violating the statute or regulation.  . . .  [I]f the primary intended beneficiary of a statute or regulation is the government, then a private party cannot complain about

---

the court did not hold that plaintiff's entitlement to a fair and accurate performance evaluation arose from Air Force regulations.  Rather, the court concluded that the Air Force regulations merely supported the court's conclusion.  See id. at 641-42 (quoting the Air Force regulations and the United States Department of Defense "CPARS Policy Guide"); see also id. (noting that defendant's arguments concerning the applicability of the "CPARS Policy Guide" were irrelevant because "entitlement to a fair and accurate performance evaluation is inherent in the entitlement to a performance evaluation").

> the government's failure to comply with that statute or regulation, even if that
> party derives some incidental benefit from compliance with it.

Id. at 1451-52 (citations omitted).  The Federal Circuit derived this legal standard from Rough
Diamond Co., id., and another, earlier decision from the Court of Claims, id. at 1452 (citing
Hartford Accident & Indemnity Co. v. United States, 127 F. Supp. 565, 567 (Ct. Cl. 1955)
("[S]ince the regulations were promulgated for the benefit of the Government, and not for the
benefit of any one else, the other party to the contract cannot complain that the regulations were
not complied with.")).  Because it found that the regulation at issue was "primarily intended to
benefit the government, not contractors," and that the regulation was "best described as [an]
internal operating provision for the management of funds within the agency," the Federal Circuit
concluded that the contractor could not rely on the regulation in support of its case.  Id.

The third decision offered by defendant in support of its argument is Freightliner Corp. v.
Caldera, in which the contractor requested compensation for work it performed under a contract
option, alleging that the exercise of the option by the United States Army Tank-Automobile
Command ("Command") was ineffective.  225 F.3d 1361, 1362-63 (Fed. Cir. 2000).  In
particular, the contractor argued that the Command violated a regulation requiring use of
"noncompetitive procedures before exercising an option when the option price was not evaluated
in an original competitive solicitation[.]"  Id. at 1364.  Citing Rough Diamond Co. and Cessna
Aircraft Co., the Federal Circuit provided further guidance concerning the governing legal
standard:

> In order for a private contractor to bring suit against the Government for
> violation of a regulation, that regulation must exist for the benefit of the private
> contractor.  If, however, the regulation exists for the benefit of the Government,
> then the private contractor does not have a cause of action against the Government
> in the event that a contracting officer fails to comply with the regulation.

Id. at 1365 (citations omitted).  It then found that the regulation "serves as an internal operating
procedure" and "exists to ensure that the contracting officer acts in the best interest of the
government; it therefore does not exist for the benefit of the contractor."  Id.  Accordingly, the
Federal Circuit concluded that any violation of the regulation would not render the exercise of
the option ineffective.  Id.

The Court of Claims and the Federal Circuit have articulated the applicable legal standard
in other decisions, not relied upon by defendant, framing the standard in light of each case's
unique factual circumstances.  For example, in Chris Berg, Inc. v. United States, the Court of
Claims asserted that "[i]f a regulation appears intended to define and state the rights of a class of
persons, it is presumptively intended to benefit those persons."  426 F.2d 314, 317 (Ct. Cl. 1970)
(citing Fletcher v. United States, 392 F.2d 266 (Ct. Cl. 1968)).  In Alyeska Pipeline Service Co.
v. United States, the Court of Claims stated that "a voluntary payment may be recovered if the

statute barring the payment was enacted for the benefit of the person seeking recovery but may not be recovered if enacted for the benefit of another." 624 F.2d 1005, 1017-18 (Ct. Cl. 1980). And, in American Telephone & Telegraph Co. v. United States, the Federal Circuit found that "cautionary and informative regulations and directives" that "provide only internal government direction . . . supply no remedy for private parties in a judicial forum." 307 F.3d 1374, 1380 (Fed. Cir. 2002). However, none of the decisions cited by defendant or discussed by the court addresses the situation where a regulation was issued to benefit both the government and contractors equally–the precise circumstances presented in the instant case. Cf. Todd Constr. L.P. v. United States, No. 07-324C, 2010 WL 3022209, at *8 (Fed. Cl. July 30, 2010) (noting that "statutes and regulations can be intended to benefit both the Government and other parties").

The portion of the FAR that concerns contractor performance information, subpart 42.15, was added to the FAR in 1995, and was intended to implement Office of Federal Procurement Policy Letter 92-5, Past Performance Information.[14] Past Performance Information, 60 Fed. Reg. 16,718, 16,719-20 (Mar. 31, 1995) (to be codified at 48 C.F.R. pts. 9, 15, 42); accord Past Performance Information, 59 Fed. Reg. 8,108, 8,108 (proposed Feb. 17, 1994). The Office of Federal Procurement Policy issued Policy Letter 92-5 in 1993. Past Performance Information, 58 Fed. Reg. 3,573 (Jan. 11, 1993). The stated purpose of the policy letter was to "establish[] requirements for evaluating contractor performance and for using past performance information in the contractor selection process." Id. at 3,575. In the policy letter's "Background" paragraph, the Office of Federal Procurement Policy explained:

> A contractor's past performance record is a key indicator for predicting future performance. A satisfactory performance record is a prerequisite to being determined a "responsible source" pursuant to 41 U.S.C. 403. In addition, FAR 15.605 requires that quality be addressed in every source selection and recognizes past performance as a factor in assessing quality. Several agencies have established policies and procedures for collecting, recording and using past performance information. These practices are extremely important to both the Government and to contractors, and requirements are necessary to help ensure their integrity and fairness. This Policy Letter provides such requirements.

---

[14]   Initially, FAR subpart 42.15 expressly referenced the policy letter. See 48 C.F.R. § 42.1500 (1996) ("This subpart provides policies and establishes responsibilities for recording and maintaining contractor performance information. It implements Office of Federal Procurement Policy Letter 92-5, Past Performance Information."). In 2000, the Office of Federal Procurement Policy determined that the FAR accurately reflected the then-current policy and rescinded the policy letter as unnecessary. Rescission of Office of Federal Procurement Policy, 65 Fed. Reg. 16,968 (Mar. 30, 2000). The reference to the policy letter in FAR subpart 42.15 was subsequently deleted. Rescission of Office of Federal Procurement Policy Letters, 65 Fed. Reg. 36,014 (June 6, 2000).

Id. (emphasis added).  Thus, in adding subpart 42.15 to the FAR to describe the policies and procedures for "recording and maintaining past performance information," 48 C.F.R. § 42.1500 (2005), federal acquisition officials understood that both government agencies and government contractors would benefit from its provisions.

Indeed, it is not difficult to discern how or why, and the extent to which, the preparation of fair and accurate performance evaluations benefits both government agencies and government contractors.  With respect to ongoing contracts, government agencies benefit from interim evaluations that fairly and accurately reflect a contractor's performance because they will be more likely to receive the desired response from evaluated contractors–either a continuation of good performance or an improvement of bad performance.  See Office of Fed. Procurement Policy, Best Practices for Collecting and Using Current and Past Performance Information (May 2000), available at http://www.whitehouse.gov/omb/best_practice_re_past_perf/.  Government contractors will similarly benefit from fair and accurate interim evaluations because they will be able to adjust their performance, if necessary, prior to the contract's completion, resulting in an optimal final evaluation.  See id. ("The better the contractor performance evaluation, the more competitive the contractor will be for future work.").

With respect to completed contracts, government agencies will be more secure in their source selection decisions knowing that the past performance information in their possession is fair and accurate; unfair and inaccurate performance evaluations are highly detrimental to the source selection process.  Similarly, government contractors will be more confident in the source selection process knowing that the past performance information of all offerors fairly and accurately reflect the offerors' actual performance.  In particular, contractors that receive unwarranted poor assessments begin with a disadvantage in future procurements because they must explain away incorrect information that should not have been part of the evaluation in the first place.  And, contractors competing against an offeror that has received an unwarranted good assessment may lose a competitive advantage to the extent that their own evaluations fairly and accurately reflect good past performance.  See id.

Accordingly, in practice, government contractors, both during and after contract performance, receive benefits from fair and accurate performance evaluations that are at least as important as the benefits afforded government agencies.[15]  As a result, government contractors, as a class, are more than just incidental beneficiaries of FAR subpart 42.15.  The court therefore concludes that the regulation upon which plaintiff's CDA claim is based–FAR § 42.1502(a)–

---

[15]  Because the use of past performance information in making future source selection decisions benefits both the procuring government agency and the contractors competing for the contract, the fact that FAR subpart 42.15 describes past performance information as "relevant information, for future source selection purposes, regarding a contractor's actions under previously awarded contracts," 48 C.F.R. § 45.1501 (emphasis added), does not alter the court's analysis.

sufficiently benefits plaintiff such that plaintiff is entitled to seek judicial relief for a purported violation of the regulation.  Thus, plaintiff meets the "matter of right" requirement.

## 2.  Plaintiff Requests Relief Related to the Contract

The next argument raised by defendant is that plaintiff's January 12, 2007 response to the CPAR is not a claim under the CDA because plaintiff does not seek relief "arising under or relating to" its contract with the Air Force.  Defendant did not raise this issue in its original motion to dismiss.  BLR Group of Am., Inc., 84 Fed. Cl. at 639 n.5.  Thus, in its prior ruling, the court noted that there was "no question that plaintiff's request for a fair and accurate CPAR . . . sought relief related to the contract . . . ."  Id. at 642.  Defendant now contends that relief relates to a contract only if the contractor requests that relief pursuant to a contractual theory, such as breach of contract, mistake, or misrepresentation.  Thus, defendant argues that because plaintiff does not assert such a contractual theory, the relief plaintiff seeks–revision or rescission of its CPAR–cannot relate to the contract.  The court does not agree.

In support of its position, defendant relies heavily upon the decision of the Court of Claims in Paragon Energy Corp. v. United States, 645 F.2d 966 (Ct. Cl. 1981).  In that case, the contractor discovered after contract award that it had made a clerical error in calculating its bid. Id. at 970.  It thus submitted a claim to the contracting officer requesting a correction of the contract price.  Id.  After the contracting officer denied the claim, the contractor filed suit.  Id. at 970-71.  It alleged that it was entitled to "contract modification and monetary compensation" based upon "the equitable principles which [the Court of Claims] has implemented in reforming contracts under the Tucker Act" and "the contract adjustment authority contained in Public Law 85-804."  Id. at 967.  The Court of Claims had no difficulty concluding that claims for contract reformation based on equitable principles, such as the contractor's claim, are cognizable under the CDA.  Id. at 967, 972, 975.  However, the court reached the opposite conclusion with respect to claims based on Public Law 85-804.  Id. at 972.

Public Law 85-804 authorizes, upon compliance with specified procedures, certain government agencies to enter into or modify contracts "'without regard to other provisions of law relating to the making, performance, amendment, or modification of contracts'" if "'such action would facilitate the national defense.'"  Id. at 968 (quoting Act of Aug. 28, 1959, Pub. L. No. 85-804, § 1, 72 Stat. 972, 972 (codified at 50 U.S.C. § 1431 (1976))).  Public Law 85-804's implementing regulations specify that contract mistakes, either unilateral or mutual, can be remedied under the law's provisions.  Id. at 969.  Thus, the question presented to the Court of Claims was whether a claim for contract adjustment under Public Law 85-804 related to the contract such that the claim was cognizable under the CDA.  Id. at 971-72.  To answer this question, the court turned to the legislative history of the CDA.  Id. at 972-75.

As an initial matter, the court observed that both the United States Senate ("Senate") and the United States House of Representatives ("House") indicated that the CDA "was intended to implement the recommendations of the Commission on Government Procurement," which had

suggested that contracting agencies should be empowered "'to settle and pay, and administrative forums to decide, all claims or disputes arising under or growing out of or in connection with the administration or performance of contracts entered into by the United States.'" Id. at 972 (quoting 4 Report of the Commission on Government Procurement 22 (1972)).  Accordingly, the first version of the bills reported out of committee provided that "each executive agency was":

> "authorized to settle, compromise, pay, or otherwise adjust any claim by or against, or dispute with, a contractor relating to a contract entered into by it or another agency on its behalf, including a claim or dispute initiated after award of a contract, based on breach of contract, mistake, a misrepresentation, or other cause for contract modification or rescission."

Id. at 973 (quoting H.R. 11002, 95th Cong. § 4 (1978); S. 3178, 95th Cong. § 4(a) (1978)); see also id. ("'This language would end the distinction . . . between claims arising under the contract, which may be adjudicated administratively on their merits, and those not specifically included under the disputes clause of the contract (such as requests for reformation or claims for breach of contract, on which adjudication can be obtained only in the courts).'" (quoting H.R. Rep. No. 95-1556, at 17-18 (1978))).

Although the quoted language from the Senate and House bills was meant to implement the recommendation of the Commission on Government Procurement, there was concern that the language "'might be construed as authorization for agencies to settle claims independent of their legal or contractual merits[,] so-called "horse trade" settlements[,] which' technically could only be done 'through resort to Public Law 85-804 with its safeguards[,] including congressional review.'" Id. (quoting S. Rep. No. 95-1118, at 5 (1978)).  Supporters of the language attempted to clarify its meaning; the authors of the Senate Report stated that "'it is not the intent of this section (the "all disputes" clause) to authorize Agency heads, contracting officers, or agency boards to settle or compromise claims independent of their legal or contractual merits, except as specifically authorized by other statutes such as Public Law 85-804,'" id. at 974 (quoting S. Rep. No. 95-1118, at 19 (1978)), while Senator Proxmire opined that "'[t]he act does not deal with the set of problems that fall under Public Law 85-804.  Public Law 85-804 provides for extra contractual relief to contractors.  It is not, strictly speaking, a mechanism for resolving contract disputes,'" id. (quoting 124 Cong. Rec. S18639 (daily ed. Oct. 12, 1978)).  Ultimately, the bills were amended to remove the quoted language.  Id.  New language was added in different sections of each bill that provided: "'In exercising (its) jurisdiction, the agency board is authorized to grant any relief that would be available to a litigant asserting a contract claim in the Court of Claims.'" Id. (quoting the amendments).  Senator Byrd explained the purpose of the amendments:

> "The amendments . . . address the concerns expressed by (several Senate committees) that the Act not permit the Contracting Officer or the Agency Boards to grant the discretionary relief solely authorized by Public Law 85-804.  The Act does not permit contracting officers or Agency Boards to grant such relief.

> Executive agency compromise and settlement authority is not addressed in this
> Act as this is a matter considered to be included in their existing procurement/
> acquisition authority under the established precedents."

Id. (quoting 124 Cong. Rec. S18639-41 (daily ed. Oct. 12, 1978)).  The CDA was enacted as
amended.  Id.  In light of this legislative history, the Court of Claims concluded:

> There is no question that Congress intended to exclude from the operation of the
> Contract Disputes Act the broad[] discretionary settlement authority conferred by
> laws such as Public Law 85-804.  For this reason, we hold that a claim solely and
> directly based upon 85-804 . . . is precluded from consideration under the Contract
> Disputes Act.

Id. at 974-75.

       In defendant's view, Paragon Energy Corp. stands for the proposition that "a claim relates
to a contract, for purposes of the CDA, if it seeks relief based upon 'a valid contractual theory,'
but there can be no CDA 'claim' if the contractor seeks 'extracontractual relief,' like the relief
provided for by Public Law 85-804."  Def.'s Supplemental Br. Supp. Its Mot. Partial Recons.
("Def.'s Br.") 4.  The court does not agree with defendant's broad reading of the Court of
Claims' decision.

       First, it is important to note that the Court of Claims was faced with a narrow inquiry:
whether, under the CDA, the contractor could maintain a claim for contract modification based
on either equitable principles or Public Law 85-804.  Paragon Energy Corp., 645 F.2d at 967,
975.  Thus, its holding was equally narrow: the contractor could maintain a CDA claim for
contract modification based on equitable principles, but not based on Public Law 85-804.  Id. at
967; accord Parsons Transp. Group, Inc. v. United States, 84 Fed. Cl. 779, 782 (2008) ("[W]hat
the court decided in Paragon Energy was that the CDA did not provide a basis for Paragon to
challenge the agency's decision declining to modify the contract under the discretion Public Law
No. 85-804 afforded it.").  Indeed, its review of the legislative history led the Court of Claims to
conclude only that "Congress intended to exclude from the operation of the Contract Disputes
Act the broad[] discretionary settlement authority conferred by laws such as Public Law 85-804."
Paragon Energy Corp., 645 F.2d at 974-75.  It did not hold that a contractor seeking other forms
of "extracontractual relief" could never obtain such relief under the CDA.  See also id. at 975
(noting that "all contractor claims based upon a valid contractual theory fall within the procuring
agencies' jurisdiction under the Contract Disputes Act," without commenting on whether claims
not based on a contractual theory could fall within the ambit of the CDA).

       Second, the legislative history recited by the Court of Claims supports a broader
understanding of the types of claims that relate to a contract.  For example, the goal of the
language included in the initial Senate and House bills was to permit contracting agencies to
decide "'all claims or disputes arising under or growing out of or in connection with the

-18-

administration or performance of contracts entered into by the United States.'"  Id. at 972 (quoting 4 Report of the Commission on Government Procurement 22).  The language of the bills reflected this broad goal by listing contract-type disputes as examples of valid CDA claims without excluding other types of disputes.  See id. at 973 (noting that agencies were authorized to entertain disputes "'relating to a contract, . . . including'" contract-type claims (quoting H.R. 11002 § 4; S. 3178 § 4(a)) (emphasis added)).  Neither the Commission on Government Procurement nor Congress limited CDA claims to those that were based on a contractual theory.[16]

Defendant's reliance on Paragon Energy Corp. is unwarranted even assuming that the holding of the Court of Claims should be read more broadly to mean that to the extent that a contractor is seeking "extracontractual relief," there can be no CDA claim.  Binding precedent supports the view that the provisions of FAR subpart 42.15 should be read into the contract as mandatory terms.  SCM Corp. v. United States, 645 F.2d 893, 903-04 (Ct. Cl. 1981) (per curiam) (noting that regulations concerning the exchange of purchase information between two procuring agencies "are deemed terms of the contract even if not specifically set out therein"); De Matteo Constr. Co. v. United States, 600 F.2d 1384, 1391 (Ct. Cl. 1979) (per curiam) (holding that United States Postal Service regulations "issued pursuant to statutory authority . . . have the force and effect of law, and, if they are applicable, they must be deemed terms of the contract even if not specifically set out therein"); G.L. Christian & Assocs. v. United States, 312 F.2d 418, 424 (Ct. Cl. 1963) (concluding that if the Armed Services Procurement Regulations, which "were issued under statutory authority" and "had the force and effect of law," applied to the contract at issue, "there was a legal requirement that the contract . . . be read as if" it contained the clauses required by the regulations); accord Todd Constr. L.P., 2010 WL 3022209, at *9.

Defendant's argument to the contrary is unavailing.  Citing two recent Federal Circuit decisions, defendant contends that "not every violation of statute or regulation that bears some relationship to the performance of a contract gives rise to a contract claim."  Def.'s Br. 11.  In the first of the two decisions, the Federal Circuit held that the reference to the Endangered Species Act ("ESA") in one of the contract clauses was "not sufficient to incorporate the ESA or its implementing regulations into the contract."  Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 826 (Fed. Cir. 2010).  It explained: "To incorporate material by reference, a contract must use clear and express language of incorporation, which unambiguously communicates that the purpose is to incorporate the referenced material, rather than merely acknowledge that the referenced material is relevant to the contract."  Id. (citing Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1344-45 (Fed. Cir. 2008)).  In the second decision, the Federal Circuit held that the government's "regulatory duty to remove any contraband from [forfeited

---

[16]  It also bears noting that the FAR definition of a claim describes the relief that contractors are permitted to request as "the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract."  48 C.F.R. § 52.233-1.  Thus, the FAR seemingly differentiates claims for contract reformation and contract interpretation from other types of claims.

vehicles prior to sale] . . . does not provide a contractual warranty to future purchasers that it has done so." Agredano v. United States, 595 F.3d 1278, 1281 (Fed. Cir. 2010).  In other words, "the source of any responsibility on the part of [the government] to search vehicles and remove contraband is its regulatory function and a failure to adequately perform this responsibility does not provide a contractual remedy." Id.  However, the regulations at issue in Precision Pine & Timber, Inc. and Agredano were not intended to be generally applicable to all contracts with the government.  Accord Todd Constr. L.P., 2010 WL 3022209, at *8.  In contrast, FAR subpart 42.15, by its terms, directly applies to a wide range of government procurement contracts, including the contract at issue in this case.  See 48 C.F.R. § 42.1502 (indicating that "agencies shall prepare an evaluation of contractor performance" for all contracts exceeding a certain dollar amount, other than those with nonprofit agencies employing the blind or severely disabled, those for construction services, and those for architect/engineering services).

    Also unpersuasive is defendant's reliance on Schickler v. Davis, in which the Federal Circuit held that the General Services Administration Board of Contract Appeals ("Board") lacked jurisdiction under the CDA to entertain a contractor's claim for wrongful debarment.  10 Fed. App'x 944, 945 (Fed. Cir. 2001) (per curiam) (unpublished decision).  In Schickler, the contractor alleged that he was wrongfully debarred as a result of his performance of a contract with the General Services Administration ("GSA").  Id.  The Federal Circuit noted that the contractor's claim was not based on any breach of contract by the GSA.  Id. at 946.  Rather, the contractor asserted that the Board possessed jurisdiction "because all the acts that caused the claimed damages resulted from the contract" with the GSA.  Id.  Although the Federal Circuit agreed that there was "some connection between the alleged wrongful act by the government and a procurement contract," it declined to adopt the contractor's jurisdictional argument because "the connection between the alleged wrongful debarment and [the contractor]'s contract with GSA was merely tangential."  Id.  In this case, however, the Air Force was required to prepare and disseminate a fair and accurate evaluation of plaintiff's contract performance–a requirement equivalent to a mandatory contract term.  Thus, the connection between the Air Force's purported wrongful act–the preparation and dissemination of an unfair and inaccurate performance evaluation–and plaintiff's contract with the Air Force is more than tangential.  Accord Todd Constr. L.P., 2010 WL 3022209, at *9 n.6 ("[T]he connection between the performance evaluation and the contract is not 'tangential' . . . .").

    In sum, defendant has failed to convince the court that a claim for a fair and accurate performance evaluation pursuant to FAR § 42.1502(a) does not relate to a procurement contract to which the provision applies.  Accordingly, the court concludes that plaintiff can assert such a claim under the CDA.  Accord Todd Constr. L.P. v. United States, 85 Fed. Cl. 34, 44-45 (2008) ("It simply defies reason to contend, as the Government does, that [the contractor]'s assertion that its performance evaluations were inaccurate and procedurally improper 'does not bear any relationship to the terms or performance of the contract.' . . .  If there had been no contract, there would be no evaluations.  The subject of the evaluations is the quality of the contractor's performance under the terms of the contract (and, of course, any modifications).  As a matter of

logic, a performance evaluation relates to the contractor's performance under the contract, in the same way that any evaluation relates to the thing evaluated." (citation omitted)).

### 3. Plaintiff's Response to the CPAR Does Not Constitute a CDA Claim

Defendant next contends–for the first time on reconsideration–that plaintiff's January 12, 2007 response to the CPAR cannot constitute a CDA claim because it is not a demand for relief pursuant to the FAR definition of a claim.  Because the issue was not argued earlier, the court, in its prior ruling, noted that there was "no question that plaintiff's request for a fair and accurate CPAR was made to the contracting officer in writing and sought relief related to the contract . . . ." BLR Group of Am., Inc., 84 Fed. Cl. at 642.  Now, however, defendant contends that plaintiff's January 12, 2007 communication constitutes nothing more than contractor comments pursuant to FAR § 42.1503(b), which allows contractors to submit "comments, rebutting statements, or additional information" in response to performance evaluations.  In other words, defendant argues that because plaintiff was acting within the confines of the FAR's performance evaluation procedures, it could not have been asserting a claim pursuant to the CDA.  The court agrees.

As a general matter, there is "no requirement in the [CDA] that a 'claim' must be submitted in any particular form or use any particular wording."  Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987); see also Transam. Ins. Corp. v. United States, 973 F.2d 1572, 1578 (Fed. Cir. 1992) (noting that "certain 'magic words' need not be used and that the intent of the 'claim' governs").  "All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim."  Contract Cleaning Maint., Inc., 811 F.2d at 592.  Thus, the contractor's request for a decision from the contracting officer need not be explicit; it may be implied.  James M. Ellett Constr. Co., 93 F.3d at 1543; see also Transam. Ins. Corp., 973 F.2d at 1576 ("The statute's broad language demonstrates that as long as what the contractor desires by its submissions is a final decision, that prong of the CDA claim test is met.").

Unquestionably, the Federal Circuit has crafted a broad definition explaining what qualifies as a valid demand for relief.  And, on its face, plaintiff's response to the CPAR appears to fall within the definition.  In its response to the CPAR, plaintiff provided, in relevant part:

[Plaintiff] is forced to place on the record doubts about the objectivity of Ms. Jo Brown-Leiker, one of the authors of the CPARS narrative.  Throughout contract performance, Ms. Brown-Leiker was the QAP primarily in charge of tasking and evaluating [plaintiff].  Despite questions about her objectivity, the Air Force charged her with drafting a CPARS assessment of [plaintiff]'s contract performance.  [Plaintiff] previously objected on the record to her involvement in the Contract, requesting a new QAP because of apparent bias.  It now strenuously objects to her participation in this evaluation process.

Case 1:07-cv-00579-MMS   Document 55   Filed 08/16/10   Page 22 of 23

As of 9 January 2007, the Air Force maintains that the facts indicating Ms. Brown-Leiker's bias are "irrelevant" to its obligation to provide a fair, accurate and objective CPARS assessment. Its concerns have been ignored by the Air Force, so [plaintiff] feels compelled to outline the facts below, for readers of the CPARS assessment to judge.

. . . .

. . . . I do not concur with this assessment and request that it be reevaluated.

Def.'s App. 20. With this language, plaintiff appears to provide notice to the contracting officer of the basis of its claim–that Ms. Brown-Leiker's bias prevented the preparation of a fair, accurate, and objective CPAR–and the relief it sought–a new evaluation.

Nevertheless, if a contracting officer receives a document in a context wholly separate and distinct from the CDA claim process, the court cannot expect the contracting officer to treat that document as a CDA claim. Thus, when Ms. Kreke received plaintiff's response to the CPAR in her role as Assessing Official, she was obligated only to treat the response as contractor comments to a performance evaluation pursuant to FAR § 42.1503(b), and not also as a CDA claim. Accordingly, the court finds merit in defendant's newly advanced argument and concludes that plaintiff has not submitted a valid claim under the CDA.[17]

### 4. There Is No Contracting Officer Decision or Deemed Denial

Finally, defendant contests the court's previous finding that because the contracting officer did not respond to plaintiff's claim for over twenty-two months, an unreasonable length of time, plaintiff's claim was deemed denied. As a logical extension of its previous argument, defendant contends that if an agency complies with the procedures described in FAR § 42.1503(b) regarding the evaluation of contractor performance, a contracting officer who receives comments from a contractor regarding a performance evaluation would have no reason to believe that any further action on those comments was necessary once those comments were

---

[17] Defendant also contends that plaintiff's comments cannot constitute a demand for relief because the Air Force has complete discretion concerning the contents of a performance evaluation. This contention is unpersuasive. Any discretion accorded to the Air Force is irrelevant to the question of whether plaintiff prepared a communication that constitutes a demand for relief. And, even if the Air Force's discretion is relevant to the existence of a demand for relief, the statement in FAR § 42.1503(b) that "[t]he ultimate conclusion on the performance evaluation is a decision of the contracting agency" does not give the contracting agency free license to prepare and disseminate a performance evaluation that results from unfair procedures or contains inaccurate facts. The Air Force's discretion is not limitless.

referred to a reviewing official. Thus, in defendant's view, a contracting officer would have no responsibility to issue a decision on those comments pursuant to the CDA; nor could a failure to issue a decision constitute a deemed denial, regardless of the length of time that had elapsed. Once again, the court agrees. If a contracting officer cannot be expected to understand comments from a contractor regarding a performance evaluation to be a CDA claim requesting a decision, then the contracting officer certainly is not obligated to issue a decision where no claim has been submitted. The law is well settled that contracting officers are not required to divine the existence of a claim. See Contract Cleaning Maint., Inc., 811 F.2d at 592 (holding that a contractor must provide a contracting officer with "adequate notice of the basis and amount of the claim"). To the contrary, the responsibility to articulate a claim and request a decision from a contracting officer rests squarely with the contractor. Thus, the "failure" of a contracting officer to issue a decision in the absence of a claim cannot constitute a deemed denial. Accordingly, the court revisits its earlier ruling and concludes that Ms. Kreke's failure to issue a decision in this case was not a deemed denial.

### 5. The Court Lacks Jurisdiction Over Plaintiff's First Claim for Relief

Having considered the revised jurisdictional arguments raised by defendant in its renewed motion to dismiss, the court concludes that it lacks jurisdiction to entertain plaintiff's first claim for relief under the CDA. Although plaintiff is legally entitled to a fair and accurate performance evaluation pursuant to FAR § 42.1502(a) and the relief sought by plaintiff relates to the performance of its contract, plaintiff did not submit a valid CDA claim that would have obligated the contracting officer to issue a decision. Accordingly, the court grants defendant's renewed motion to dismiss.

### IV.  CONCLUSION

For the reasons set forth above, the court **DENIES** defendant's motion to dismiss on mootness grounds, **GRANTS** defendant's renewed motion to dismiss for lack of jurisdiction,[18] and **DENIES AS MOOT** defendant's motion for summary judgment. The court dismisses plaintiff's complaint for lack of jurisdiction.[19] No costs. The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[18]  See supra note 11.

[19]  Although this decision only concerns plaintiff's first claim for relief, the court previously dismissed plaintiff's second claim for relief for lack of jurisdiction. See BLR Group of Am., Inc., 84 Fed. Cl. at 635, 643, 649.